832 F.2d 1285
 266 U.S.App.D.C. 47
 AMERICAN TELEPHONE & TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
GTE Corporation, International Business Machines
Corporation, North American Telecommunications Association,
Western Union Telegraph Company, United States Telephone
Association, MCI Telecommunications Corporation, Bell
Operating Companies, Ameritech Operating Companies, et al.,
National Association of Regulatory Utility Commissioners,
Centel Corporation, ROLM Corporation, Roseville Telephone
Company, et al., United States Transmission Systems, Inc.,
Mountain States Telephone and Telegraph Company, et al.,
United Telephone System, Inc., Teltec Saving Communications
Co., et al., American Broadcasting Companies, Inc., Citizens
of the State of Florida, Ad Hoc Telecommunication Users
Committee, Satellite Business Systems, Department of Public
Utility Control of the State of Connecticut, Dow Jones &
Company, Inc., Public Service Commission of West Virginia,
Aeronautical Radio, Inc., Intervenors.
AMERICAN TELEPHONE & TELEGRAPH COMPANY, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
United States Transmission Systems, Inc., GTE Corporation,
Ameritech Operating Companies, MCI Telecommunications
Corporation, Mountain States Telephone and Telegraph
Company, et al., BellSouth Corporation, Bell Operating
Companies, Mobile Marine Radio, Inc., Intervenors.
 Nos. 84-1148, 85-1386.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 15, 1987.
Decided Nov. 10, 1987.
 
 Michael Boudin, with whom David H. Remes, Christopher T. Curtis, Washington, D.C., J. Richard Devlin, Bedminster, N.J., and Mark C. Rosenblum, Basking Ridge, N.J., were on brief, for petitioner. Howard J. Trienens, Chicago, Ill., Alfred A. Green, New York City, and Judith A. Maynes, New Haven, Conn., also entered appearances for petitioner.
 John E. Ingle, Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, Linda L. Oliver, Counsel, F.C.C., Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents. Bruce E. Fein, Counsel, F.C.C., Barry Grossman, Nancy C. Garrison and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 
 
 1
 William J. Byrnes, with whom Michael H. Bader, Kenneth A. Cox, James E. Dunstan and John M. Scorce, Washington, D.C., were on brief, for intervenor MCI Telecommunications Corp., in Nos. 84-1148 and 85-1386. Theodore D. Kramer, Thomas R. Gibbon and Robert Michelson, Washington, D.C., also entered appearances for MCI Telecommunications Corp., in Nos. 84-1148 and 85-1386.
 
 
 2
 James R. Hobson, Michael B. Fingerhut and Mitchell F. Brecher, Washington, D.C., entered appearances for intervenor GTE Corp., in Nos. 84-1148 and 85-1386.
 
 
 3
 J. Roger Wollenberg, William T. Lake and Roger M. Witten, Washington, D.C., entered appearances for intervenor IBM Corp., in No. 84-1148.
 
 
 4
 Albert H. Kramer and Denise Bonn, Washington, D.C., entered appearances for intervenor North American Telecommunications Ass'n, in No. 84-1148.
 
 
 5
 Arthur H. Simms and Lawrence P. Keller, Washington, D.C., entered appearances for intervenor Western Union Telegraph Co., in No. 84-1148.
 
 
 6
 Thomas J. O'Reilly, Washington, D.C., entered an appearance for intervenor U.S. Telephone Ass'n, in No. 84-1148.
 
 
 7
 Thomas Pace, Princeton, N.J., entered an appearance for intervenor Dow Jones & Co., Inc., in No. 84-1148.
 
 
 8
 Raymond F. Scully, Washington, D.C., entered an appearance for intervenor Bell Operating Companies, in Nos. 84-1148 and 85-1386, Liam S. Coonan, St. Louis, Mo., William C. Sullivan, Topeka, Kan., and Linda S. Legg, St. Louis, Mo., entered appearances for Bell Operating Companies in No. 84-1148, and Alan B. Sternstein and Louise L.M. Tucker, Washington, D.C., entered appearances for Bell Operating Companies in No. 85-1386.
 
 
 9
 Thomas J. Reiman, Chicago, Ill., Charles R. Cutler and Alfred Winchell Whittaker, Washington, D.C., entered appearances for intervenors Ameritech Operating Companies, et al., in Nos. 84-1148 and 85-1386.
 
 
 10
 Charles D. Gray and Genevieve Morelli, Washington, D.C., entered appearances for intervenor Nat. Ass'n of Regulatory Utility Com'rs, in No. 84-1148.
 
 
 11
 Theodore D. Frank, Washington, D.C., entered an appearance for intervenor Centel Corp., in No. 84-1148.
 
 
 12
 Mary Jo Manning, Washington, D.C., entered an appearance for intervenor ROLM Corp., in No. 84-1148.
 
 
 13
 Gary C. Tucker, Denver, Colo., Michael L. Glaser and Francis E. Fletcher, Jr., Washington, D.C., entered appearances for intervenors Roseville Telephone Co., et al., in No. 84-1148.
 
 
 14
 John A. Ligon, Grant S. Lewis and John S. Kinzey, New York City, entered appearances for intervenor U.S. Transmission Systems, Inc., in Nos. 84-1148 and 85-1386.
 
 
 15
 Robert W. Barker and Robert B. McKenna, Washington, D.C., entered appearances for intervenors Mountain States Telephone & Telegraph Co., et al., in Nos. 84-1148 and 85-1386.
 
 
 16
 Carolyn C. Hill, Washington, D.C., entered an appearance for intervenor United Telephone System, Inc., in No. 84-1148.
 
 
 17
 Peter Tannenwald, Washington, D.C., entered an appearance for intervenor Teltec Saving Communications Co., in No. 84-1148.
 
 
 18
 Joseph M. Kittner, Randolph J. May and Timothy J. Cooney, Washington, D.C., entered appearances for intervenors American Broadcasting Companies, Inc., et al. and Ad Hoc Telecommunications Users Committee, in No. 84-1148.
 
 
 19
 Jack Shreve, Tallahassee, Fla., and Benjamin H. Dickens, Jr., Washington, D.C., entered appearances for intervenor Citizens of the State of Florida, in No. 84-1148.
 
 
 20
 Kevin H. Cassidy, New York City, Jeffrey Matsuura, Washington, D.C. and William E. Willis, New York City, entered appearances for intervenor Satellite Business Systems, in No. 84-1148.
 
 
 21
 William B. Gundling, Hartford, Conn., entered an appearance for intervenor Dept. of Public Utility Control of the State of Connecticut, in No. 84-1148.
 
 
 22
 John L. Bartlett and Robert J. Butler, Washington, D.C., entered appearances for intervenor Aeronautical Radio, Inc., in No. 84-1148.
 
 
 23
 John F. Beasley and Vincent L. Sgrosso, Atlanta, Ga., entered appearances for intervenor BellSouth Corp., in No. 85-1386.
 
 
 24
 Martin W. Bercovici, Washington, D.C., entered an appearance for intervenor Mobile Marine Radio, Inc., in No. 85-1386.
 
 
 25
 Before BORK and BUCKLEY, Circuit Judges, and EDWARD D. RE,* Chief Judge.
 
 
 26
 Opinion for the Court filed by Circuit Judge BORK.
 
 BORK, Circuit Judge:
 
 27
 American Telephone and Telegraph Company ("AT & T") and its long distance service competitors ("Other Common Carriers" or "OCCs") use the facilities of local telephone companies to originate and terminate interstate calls. Because some local exchanges have not yet converted their facilities to provide equal access to all carriers, AT & T is the only carrier with "premium access" at some locations. The OCCs receive access at these locations which is inferior with respect to the quality of transmission, the connection time, the type of phone that can be used, the quantity of numbers that must be dialed, and with respect to the ability to collect billing information. AT & T challenges several orders in which the Federal Communications Commission set a "discount" rate to be paid by the OCCs for their "non-premium" access. We find that the Commission did not act arbitrarily or capriciously in setting the discount rate and therefore deny AT & T's petition for review.
 
 I.
 
 28
 When the OCCs first entered the long distance service market they paid the local business line rate for access to local facilities. Because this rate was much lower than that charged to AT & T through the divisions of revenue process within the Bell System, and did not include any of the non-traffic sensitive, i.e., fixed, local plan costs that were allocated to interstate commerce, AT & T filed a tariff in which it proposed higher access charges for the OCCs. The proposed "Exchange Network Facilities for Interstate Access" ("ENFIA") tariff was suspended by the Commission because it raised many of the issues that the Commission was attempting to resolve in the comprehensive long distance service market structure rulemaking. See MTS & WATS Market Structure Inquiry, CC Docket No. 78-72, 67 F.C.C.2d 757 (1978)[1] ("Docket No. 78-72"). The Commission, however, encouraged AT & T and the OCCs to negotiate "some sort of a 'rough justice' interim" agreement on access charges pending a decision in Docket No. 78-72. Exchange Network Facilities for Interstate Access, 91 F.C.C.2d 1079, 1081 (1982) ("ENFIA Order After Investigation "), aff'd, MCI Telecomm. Corp., 712 F.2d 517 (D.C.Cir.1983).
 
 
 29
 After several months of negotiations, AT & T and the OCCs signed an interim settlement agreement ("the ENFIA Agreement") which the Commission accepted in 1979 as "an expeditious and acceptable compromise of differences on matters relating to methodologies, rate levels, and rate components." Exchange Network Facilities for Interstate Access, 71 F.C.C.2d 440, 456 (1979) ("ENFIA Acceptance Order "). The discounted rate element in the access charge which was adopted in the ENFIA Agreement[2] was meant to reflect in part the difference in the quality of access received by AT & T and the OCCs. Exchange Network Facilities for Interstate Access, 90 F.C.C.2d 6, 15, 16 (1982) ("ENFIA Extension Order "). The ENFIA Agreement was a transitional measure intended to remain in effect until the Commission issued a decision in Docket No. 78-72, or for five years, whichever occurred first.
 
 
 30
 While Docket No. 78-72 was pending before the Commission, AT & T entered into a consent decree pursuant to which it was required to divest itself of its local exchange companies ("Bell Operating Companies" or "BOCs"). See United States v. American Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C.1982) ("Modification of Final Judgment" or "MFJ"), aff'd, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). The MFJ also required the BOCs to provide access to carriers equal in type and quality to that provided to AT & T and to convert their facilities to equal access by September 1, 1986. 552 F.Supp. at 195-96, 227, 232-34.[3] The MFJ also expressly prohibited the BOCs from charging the same rate to AT & T and the OCCs and noted that "it would be appropriate for charges to AT & T to be increased to reflect its higher quality connection." Id. at 199 & n. 287.
 
 
 31
 In the Third Report & Order in Docket No. 78-72, the Commission set forth its initial decision on non-premium access charges. MTS & WATS Market Structure, CC Docket No. 78-72, Phase I, 93 F.C.C.2d 241 (1983) ("Access Charge Decision "). The Commission first reviewed the various access charges paid by different customers, and noted that foreign exchange ("FX") customers were paying local business line rates for access which was similar to that received by the OCCs at the higher ENFIA rates; while AT & T was paying a charge that was even higher than the ENFIA rate. Because "no one ha[d] attempted to justify the disparate rates charged for like access services," id. at 258, the Commission found them to be unlawfully discriminatory in violation of section 202(a) of the Communications Act, 47 U.S.C. Sec. 202(a) (1982). Id. The Commission also found, however, that the quality of interconnection received by the OCCs was "distinctly inferior to that received by" AT & T and concluded that AT & T would have "a substantial advantage to [the OCCs] unless access pricing is adjusted to account for quality differences until equal interconnection is available to all interexchange carriers." Id. at 286. The Commission then attempted to set an access charge which would reflect the inferior quality of the access received by the OCCs.
 
 
 32
 The Commission determined first that the premium value of AT & T's superior access should be equal to the "opportunity cost" to the OCCs, which the Commission defined as "equal to the amount that other carriers would be willing to pay for this preferred access." 93 F.C.C.2d at 287. The Commission noted that it would "probably be necessary to conduct an auction to determine the amount a carrier would pay for such premium access" but concluded that an auction would not be feasible. Id. The Commission found instead that AT & T should pay a lump sum equal to the premium value. The Commission determined that the premium should be lower than the ENFIA discount because the ENFIA Agreement was designed to compensate for the disparate rates paid by users other than AT & T and the OCCs, and because some OCCs would be receiving equal access. Id. at 288-89. The Commission then concluded that the appropriate size of the premium was approximately $1.4 billion. Id. at 289.
 
 
 33
 In response to comments on the first Access Charge Decision, the Commission concluded that the premium value it had set in its first decision was too low and that it would be more appropriate to adopt a discount rate for OCC access than it would be to charge AT & T a lump-sum amount. MTS & WATS Market Structure, CC Docket No. 78-72, Phase I, 97 F.C.C.2d 682 (1983) ("First Reconsideration Order "). The Commission again stated its belief that "the theoretically correct method to measure opportunity cost would be an auction of premium access" and again concluded that "such an auction would be a practical impossibility because premium interconnection cannot be severed from AT & T and offered to another carrier." Id. at 724. The Commission found that the "second best" method would be to base the differential on "the competitive advantages that flow from the premium interconnection that AT & T receives compared with the interconnection offered to OCCs." Id. at 725. The Commission listed the advantages of premium access, explained their competitive effect, and determined that a 35% discount below the per-minute charges paid by AT & T for non-traffic sensitive costs would "establish a reasonable measure of [the] value" of premium access. Id. at 726-28. The 35% discount was a "composite rate"--it applied to exchanges that had converted to equal access as well as to those that had not. Because conversion to equal access was to be substantially completed over a three-year period ending on September 1, 1986, the Commission determined that the discount should fall to 23% in 1985 and to 12% from January to August 1986. Id. at 729.
 
 
 34
 In making this determination, the Commission again noted the difficulty of determining the value of premium access with any precision. 97 F.C.C.2d at 728. The Commission went on, however, to attempt to calculate the actual dollar value of the "costs" incurred by the OCCs as a result of their inferior access. The Commission again listed the "costs" of premium access and attempted to place a dollar value on each of the categories of costs listed. Id. at 729-35. This analysis produced a range of values from $1.673 to $2.779 billion. Id. at 734. The Commission adopted the midpoint of this range, $2.226 billion, as the appropriate value and determined that this was comparable to a 35% discount. Id. at 734-35.
 
 
 35
 The OCCs opposed the 35% discount and produced as support for their challenge evidence which showed that the costs of inferior access ranged from $3.9 billion to $9.3 billion. MTS & WATS Market Structure, CC Docket No. 78-72, Phase I, 97 F.C.C.2d 834, 857 (1984) ("Second Reconsideration Order "). AT & T submitted evidence which showed that the costs ranged from $.82 billion to $1.16 billion. Id. The OCCs also opposed the 35% discount on the ground that it would not provide a smooth transition from the ENFIA discount because the overall effective ENFIA discount was approximately 70% and the overall discount under the First Reconsideration Order would be approximately 20-25%. The OCCs argued that this abrupt change would threaten the viability of interchange competition during the transition period. Id. at 855-56.
 
 
 36
 The National Telecommunications and Information Administration ("NTIA") and the Justice Department also filed comments challenging the 35% discount. Both raised concerns that the abrupt change in the ENFIA differential would have negative effects on competition in the long distance service market. NTIA also challenged the Commission's method of calculating the premium value and noted that the enormous differences in the OCCs' estimates of opportunity cost "raise[d] serious doubts" that any method of calculation would be adequate. Comments of NTIA on Petitions for Further Reconsideration ("NTIA Comments") at 5, Joint Appendix ("J.A.") at 592. NTIA also stated that its "own best estimate of the premium--using the Commission's method and the data submitted by petitioners--is so tentative and subject to such wide error that we believe the Commission ought to abandon the whole enterprise and use the ENFIA rate as the basis for starting the transition." Id. at 6, J.A. at 593.
 
 
 37
 In response, the Commission noted first that retention of the 35% discount "would pose a real threat to the survival of many of the existing competitors," 97 F.C.C.2d at 858, and stressed the importance of setting the differential at a level that would not threaten interexchange competition. Id. at 859. The Commission reaffirmed its belief that the differential should be based upon the opportunity cost of premium access, id. at 858, and that it had correctly identified the factors that should be considered in placing a value on premium access, but then determined upon a review of the various estimates proffered, "that it would be virtually impossible to place an accurate dollar amount on these factors at this time." Id. at 859. The Commission concluded "that the original estimate was not sufficiently precise and that the premium value is larger than our 2.2 billion estimate." Id.
 
 
 38
 The Commission then stated that it had "decided to adopt NTIA's suggestion that we abandon the effort to calculate premium value and establish a total differential for all relevant access elements that is related to the total differential that is produced by the current ENFIA rates," 97 F.C.C.2d at 859, and thus set the discount at about three-fourths of the existing ENFIA differential. This translated into a 55% discount below the charges paid by AT & T for non-traffic and traffic sensitive costs, which the Commission concluded "should still produce a reasonably smooth transition." Id. at 861. The Commission, however, did not adopt the NTIA's rate scheme in its entirety. The NTIA had suggested that the discount should apply to all exchanges and that it should be phased out over a three-year period which would end on a specific date. The Commission decided not to "retain a fixed termination point for a differential in access prices because it is not possible to predict when, or even if, equal access will be available in every exchange that an OCC may choose to serve." Id. at 860. The Commission determined that the discount should instead apply only to those exchanges that had not yet converted to equal access and that the discount charge should end when the exchange converted to equal access. This, the Commission determined, would "reflect the progress toward equal access at a particular time" and would "more accurately reflect the access which a particular OCC receives." Id.
 
 
 39
 Because petitions to review other aspects of the Access Charge Decision had been filed in this court, AT & T filed a petition to review the 55% discount and a motion to consolidate the case with the related petitions for review. The court denied the motion. AT & T also filed a petition for reconsideration of the 55% discount with the Commission. The Commission denied the petition. MTS & WATS Market Structure, CC Docket No. 78-72, Phase I, 101 F.C.C.2d 1222 (1985) ("Third Reconsideration Order "). AT & T moved to dismiss its original petition and filed a petition to review the Third Reconsideration Order.
 
 II.
 
 40
 On review, we must set aside the Commission's decision if we determine that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982). This review is a narrow one; we must affirm the decision if we find that it is not contrary to law, that it is supported by substantial evidence and based upon a consideration of the relevant factors, and if we determine that the conclusions reached have a rational connection to the facts found. FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 803, 814-15, 98 S.Ct. 2096, 2121-22, 56 L.Ed.2d 697 (1978); NAACP v. FCC, 682 F.2d 993, 997-98 (D.C.Cir.1982). When, as in this case, "an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer," our role is more limited; we require only that the agency "so state and go on to identify the considerations it found persuasive." National Ass'n of Regulatory Util. Comm'rs. v. FCC, 737 F.2d 1095, 1140 (D.C.Cir.1984) ("NARUC ") (internal quotations omitted), cert. denied, 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985).
 
 
 41
 AT & T does not challenge the Commission's determination that the OCCs receive inferior access or the conclusion that the OCCs should receive a discount that is based on the value of AT & T's premium access. Instead, AT & T argues that the Commission's decision is arbitrary and capricious because the discount rate adopted by the Commission is not based upon the difference in the value of access or upon any other statutory criteria. As support for this proposition, AT & T relies on the Commission's statement in the Second Reconsideration Order that it had decided to "abandon the effort to calculate premium value and establish a total differential for all relevant access elements that is related to the total differential that is produced by the current ENFIA rates." 97 F.C.C.2d at 859.
 
 
 42
 AT & T has misconstrued the Commission's actions on reconsideration. The Commission did not abandon its effort to base the discount on the value of premium access. Instead, it abandoned one method of measuring that value and adopted a different method of measuring the same value. The record evidence supports this interpretation of the Commission's actions.
 
 
 43
 First, the statement relied upon by AT & T must be read in context. When the Commission said that it was abandoning "the effort to calculate premium value," it was referring to its previous effort to place a dollar value on the individual technical differences between premium and non-premium access. The full Commission statement was as follows:
 
 
 44
 We still believe that, in general we correctly identified the various factors that should be considered in placing a value on premium access.... However, examination of the comments has convinced us that it would be virtually impossible to place an accurate dollar amount on these factors at this time. The parties have submitted detailed estimates of what they believe to be the appropriate value that we should attach to each of the elements that make up premium access. These estimates vary tremendously, and we can see no way to determine which, if any, of those estimates are more accurate than the others.
 
 
 45
 97 F.C.C.2d at 859 (emphasis added). This language immediately precedes the one sentence which is the sole support for AT & T's argument. Thus, when read in context, it is clear that the Commission was not abandoning any attempt to base the discount on the difference in value. It was simply abandoning its attempt to place a "dollar amount" "on each of the elements that make up premium access." Id.
 
 
 46
 This interpretation is supported by the Commission's explanation in the Third Reconsideration Order. The Commission explained that in the Second Reconsideration Order, it had "decided that [the] efforts to establish the value of premium access by reference to an opportunity cost analysis while conceptually sound and focused on the relevant factors, produced results that were too imprecise and unstable to provide a reliable basis for establishing the differential between premium and nonpremium access charges." 101 F.C.C.2d at 1228 (emphasis added). Thus, the Commission was abandoning one method of determining value--the elaborate opportunity cost analysis it had previously adopted and which had produced a wide range of dollar values. Again, there is no evidence that the Commission was abandoning "value" as the basis for its decision.
 
 
 47
 Second, the NTIA suggestion, which the Commission adopted in selecting the ENFIA rates as the benchmark, was premised upon the NTIA's assumption that the elaborate opportunity cost analysis and the ENFIA discount measured the same thing--the value of the difference in access:
 
 
 48
 As a long-time participant in the ENFIA proceedings, NTIA is sensitive to the difficulties of putting a number on the value of differences between AT & T and OCC interconnection arrangements....
 
 
 49
 While the Commission is to be commended for undertaking on its own motion to quantify AT & T's advantages, we note that its estimate is subject to fairly large error.... [That error] raise[s] serious doubts whether any method for calculating the "opportunity cost" of premium access ... provides an adequate basis....
 
 
 50
 ....
 
 
 51
 The ENFIA rate has several advantages over a rate based on opportunity cost calculations. Neither, of course, is based on verifiable measures of economic cost. But the ENFIA rate has been reviewed by the Courts; its adoption does not unduly prejudice the short or long-term prospects of any party; and, most important, it is the rate actually being paid by the OCCs for exchange access at this time.
 
 
 52
 NTIA Comments at 5-6, J.A. at 592-93. The clear import of this statement is that NTIA assumed that the Commission's earlier analysis and the ENFIA discount are similar in that both measure economic cost but neither does so in a manner that is mathematically verifiable. Therefore, because the attempt to "quantify" the opportunity cost is so unreliable, and the ENFIA rate has other advantages, NTIA suggested, the ENFIA rate should be used as the measure of economic cost or "value." Thus, the NTIA suggestion, which the Commission adopted, was also based upon the value of premium access.
 
 
 53
 The Commission's statement that it adopted the modified ENFIA rate to provide "a smooth transition from ENFIA to equal access that would not undermine the OCCs' ability to compete effectively," Third Reconsideration Order, 101 F.C.C.2d at 1229, also supports a finding that the modified ENFIA rate is based upon the difference in the value of access. The OCCs would be at a competitive disadvanatge unless the amount of the discount is at least equal to the competitive value of AT & T's superior access.
 
 
 54
 Finally, the adoption of the modified ENFIA rate is itself probative. The ENFIA rate represented, in part, the parties' understanding of the difference in the value of access. See ENFIA Extension Order, 90 F.C.C.2d at 15, 16. Thus, there is ample record support for the conclusion that the 55% discount was based upon the value of premium access and AT & T's challenge on this ground fails.
 
 
 55
 AT & T also argues that the 55% discount is unlawful because it is simply a continuation of rates found by the Commission in the Access Charge Decision to be unlawfully discriminatory. This is incorrect for several reasons. First, the Commission found the entire system of access rates, including those paid by FX users, private line users, and the parties to the ENFIA Agreement, to be unlawfully discriminatory. That decision was based on a finding that the parties had not provided any explanation for the rate disparaties. The Commission also explicitly noted in that decision that a non-discriminatory rate structure would have to take account of the inferior access received by the OCCs. Here, the Commission has explained that a discount is appropriate because the OCCs receive access that is inferior to that received by AT & T and has set the discount at a level which reflects the difference in the value of the access received. Thus, the Commission has provided evidence that there is a "neutral, rational basis underlying [the] apparently disparate charges," see NARUC, 737 F.2d at 1133, which precludes a finding that the rates are "unreasonably" discriminatory. See id. at 1133-34.
 
 
 56
 Second, AT & T fails to recognize that the Commission did not simply adopt the ENFIA discount rate. The Commission used the negotiated ENFIA rate as the starting point for its analysis. It then altered that rate to reflect the irrelevance of certain factors considered in determining the ENFIA rate and to take into account the competitive impact on the OCCs during the transition from the ENFIA rate. The selection of the negotiated ENFIA rate as a starting point was clearly a rational choice. That rate was the result of negotiations and reflected in part the parties' understanding of the value of AT & T's premium access. See ENFIA Acceptance Order, 71 F.C.C.2d at 454. The Commission was also fully authorized to consider the competitive impact of its decision and to adopt measures to temper that impact. See Western Union Tel. Co. v. FCC, 815 F.2d 1495, 1505 (D.C.Cir.1987); NARUC, 737 F.2d at 1135-36. Faced with an alternative method of measuring the premium value which produced grossly unverifiable variations, and which, according to two government agencies, would seriously undermine the ability of the OCCs to compete during the transition to equal access, we can hardly say that the Commission's choice of the parties' understanding of the value of premium access, when adjusted to reflect changes in certain factors, was an irrational one.
 
 
 57
 Finally, AT & T argues that the Commission's decision is not supported by the record because the NTIA's plan contemplated initial use of the ENFIA discount with a consequent phasing out of the discount over a short transition period. Thus, AT & T argues, there is no support in the record for the Commission's adoption of a "permanent" discount at the unconverted exchanges.
 
 
 58
 AT & T fails to note, however, that the Commission provided a rational explanation for its departure from this part of NTIA's suggestion. The Commission rejected the NTIA's suggestion of a transitional rate that would apply to all exchanges and adopted a "permanent" rate that would apply only to unconverted exchanges for two reasons. First, the Commission decided to abandon an arbitrary fixed termination point for the discount rate because it "is not possible to predict when, or even if, equal access will be available in every exchange that an OCC may choose to serve." Second Reconsideration Order, 97 F.C.C.2d at 860. Additionally, the Commission found that the numerous proceedings that would be required to adapt the differential to reflect ongoing conversions could be avoided if the rate applied only to those exchanges that had not converted to equal access. The Commission also explained that adopting separate rates for converted and unconverted exchanges would more accurately reflect the access of individual OCCs: "A nationwide composite rate that is applied to all OCC access may not reflect relative advantages or disadvantages of particular OCCs that serve different geographic areas." Id. Again, this is an entirely rational explanation for the Commission's decision to reject this part of NTIA's suggestion and we can discern no reason to disturb that decision here. See Farmers Union Cent. Exch., Inc. v. FERC, 734 F.2d 1486, 1511 (D.C.Cir.), cert. denied, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984) (The agency's duty is "to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.").[4]
 
 
 59
 The petition for review is therefore denied.
 
 
 
 *
 Of the United States Court of International Trade, sitting by designation pursuant to 28 U.S.C. Sec. 293(a) (1982)
 
 
 [1]
 In Docket No. 78-72, the Commission adopted a comprehensive rate scheme to compensate local companies for the costs of providing access for the origination and termination of interstate calls. Several parts of the scheme were upheld by this court in National Ass'n of Reg. Util. Comm'rs v. FCC, 737 F.2d 1095 (D.C.Cir.1984) ("NARUC "), cert. denied, 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985). Though the non-premium discount issue was not decided in NARUC, the court did state that "transitional considerations based on preserving universal subscription and avoiding disruptions in service may lawfully be considered in structuring a rate scheme" for premium and non-premium access. 737 F.2d at 1135 n. 35
 
 
 [2]
 The ENFIA rate scheme had three elements: (1) a charge for a private line connection between an OCC and the local exchange; (2) a charge for traffic sensitive local exchange costs which was paid on a per-minute basis, and (3) a charge for non-traffic sensitive local exchange costs which was derived by multiplying a discount factor to the per-minute charge paid by AT & T. The discount on Rate Element 3 for the first part of the interim period was 65% and it decreased incrementally to 45% for the remainder of the period. In 1982, the Commission extended the ENFIA agreement and maintained the 45% discount. Exchange Network Facilities for Interstate Access, 90 F.C.C.2d 6 (1982). The extension was upheld by this court in MCI Telecomm. Corp. v. FCC, 712 F.2d 517 (D.C.Cir.1983)
 
 
 [3]
 As of September 1, 1986, approximately 70% of all BOC lines had been converted to equal access. Brief for Respondents at 8 n. 16. In 1984, GTE Corporation entered into an agreement with the Justice Department which requires it to convert two-thirds of its exchange access lines by September 1, 1987 and to convert all local offices serving more than 10,000 exchange lines by 1990. The agreement also provides that, without regard to the proposed schedule, GTE must provide equal access within 12 months of any request by a carrier other than AT & T. United States v. GTE Corp., 603 F.Supp. 730, 744 (D.D.C.1984). In March 1985, the Commission adopted requirements for conversion of the remaining independent local offices. MTS & WATS Market Structure, CC Docket No. 78-72, Phase III, 100 F.C.C.2d 860 (1985). Some of these offices are required to convert to equal access within three years of a reasonable request or, in the absence of a request, as soon as is practicable. Offices with less sophisticated switching equipment are required to convert only as soon as is practicable. Id. at 875
 
 
 [4]
 In its reply brief to this court, AT & T challenges for the first time the Commission's determination that the effective discount under ENFIA was approximately 70%. Because this challenge was not raised below, we will not consider it here. See 47 U.S.C. Sec. 405 (1982); Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 681-82 (D.C.Cir.1983)