## MCI TELECOMMUNICATIONS CORPORATION, Petitioner,

v.

## FEDERAL COMMUNICATIONS COMMISSION; United States of America, Respondents.

Sprint Communications Company, L.P., et al., Intervenors.

No. 93–1464.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 1, 1994.

Decided June 27, 1995.

Paul M. Smith argued the cause for petitioner. On the briefs were Frank W. Krogh and Donald J. Elardo.

Carl D. Lawson, Counsel, F.C.C., argued the cause for respondents. With him on the briefs were Anne K. Bingaman, Asst. Atty. Gen., Catherine G. O'Sullivan and Nancy C. Garrison, Attys., U.S. Dept. of Justice, William E. Kennard, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and John Ingle, Deputy Associate Gen. Counsel, F.C.C. Laurence N. Bourne, entered an appearance for respondents.

Leon M. Kestenbaum and Michael B. Fingerhut, filed the brief for intervenor Sprint Communications Co. Harold R. Juhnke, entered an appearance for Sprint Communications Co. Genevieve Morelli, filed the brief for intervenor Competitive Telecommunications Ass'n. Roy L. Morris, filed the brief for intervenor Allnet Communications Services, Inc. Barbara J. Kern, filed the brief for intervenors Illinois Bell Telephone Co., Indiana Bell Telephone Co., Inc., Michigan Bell Telephone Co., the Ohio Bell Telephone Co. and Wisconsin Bell, Inc. John W. Bogy and James P. Tuthill, filed the brief for intervenor Pacific Bell. James L. Wurtz, entered an appearance for Pacific Bell. Edward R. Wholl and Carlos J. Sandoval, filed the brief for intervenors New York Telephone Co. and New England Tel. & Tel. Co. Shelley E. Harms, entered appearances for New York Telephone Co. and New England Tel. & Tel. Co. Robert B. McKenna, Jr. and Laurie J. Bennett, filed the brief for intervenor US West Communications, Inc. Richard C. Hartgrove, Thomas A. Pajda and Robert M. Lynch, filed the brief for intervenor Southwestern Bell Telephone Co. Mary McDermott, filed the brief for intervenor U.S. Telephone Ass'n. Martin T. McCue, entered an appearance for U.S. Telephone Ass'n. Matthew R. Sutherland, entered an appearance for intervenor BellSouth Telecommunications, Inc. James S. Blaszak and Patricia J. Whittle, entered appearances for intervenor Ad Hoc Telecommunications Users Committee. Peter D. Keisler and David W. Carpenter, entered appearances for intervenor AT & T Co. Alfred W. Whittaker, entered an appearance for intervenor Ameritech Operating Companies. James B. Ramsey and Charles D. Gray, entered appearances for intervenor Nat. Ass'n of Regulatory Utility Com'rs.

Before WILLIAMS, GINSBURG, and ROGERS, Circuit Judges.

GINSBURG, Circuit Judge:

MCI Telecommunications Corporation petitions for review of an FCC Order that (1) requires the Bell Operating Companies to

unbundle and offer separately the access services they provide to long-distance carriers, and (2) allows the BOCs to phase out their bundled access offerings. Arguing that the Commission (1) provided inadequate notice of its intention to allow the BOCs to phase out their bundled access offerings, and (2) failed adequately to consider various important issues related to that decision, MCI and supporting intervenors ask the court to vacate the Commission's Order and remand the matter for further consideration. Because we hold that the Commission's notice failed to meet the requirements of the Administrative Procedure Act, we grant the petition and the relief requested.

## I. BACKGROUND

The BOCs and other local exchange carriers (collectively LECs) provide both long-distance telephone companies (interexchange carriers or IXCs) and enhanced services providers (ESPs) with access to local telephone users. The manner in which the BOCs offer access service to IXCs is the subject of this case. In order to understand the present dispute, however, a brief review of access regulation may be helpful.

### A. *Interexchange Carriers*

In its 1983 *Access Order*, the Commission held that there was no rational justification for the disparate nature of the access services and rates that the LECs were then offering to different IXCs. *See MTS and WATS Market Structure, Third Report and Order,* CC Docket No. 78–72, 93 FCC 2d 241 (1983) (*Access Order* ), *modified on recon.,* 97 FCC 2d 682 (1983), *modified on further recon.,* 97 FCC 2d 834 (1984), *aff'd in principal part and remanded in part, Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC,* 737 F.2d 1095 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1227, 105 S.Ct. 1224, 84 L.Ed.2d 364 (1985), *modified on further recon.,* 99 FCC 2d 708 (1984), *aff'd, American Tel. and Tel. Co. v. FCC,* 832 F.2d 1285 (D.C.Cir.1987), *modified on further recon.,* 101 F.2d 1222 (1985), *further recon. denied,* 102 FCC 2d 849 (1985). Specifically, the Commission concluded that "a single, uniform, and non-discriminatory structure for interstate access

tariffs covering those services that make identical or similar use of access facilities is required by the Communications Act." *Id.* at 250. Accordingly, the Commission prescribed the "rate elements," *i.e.,* components of service, that every LEC must offer, the methodology it must use to set rates, and the type of charge (*e.g.,* per minute, per line) it may make for each element. *See* 47 C.F.R. § 69.

Under this regulatory regime, the LECs have filed with the Commission tariffs offering access service to the IXCs in so-called "feature groups." A feature group bundles the basic rate elements set out in 49 C.F.R. § 69 together with specific features that the IXCs tend to find appropriate and useful. Because these feature group offerings are relatively uniform across LECs, the IXCs have been able to develop and use automated ordering, auditing, and payment systems for their purchase of local access services. In order to preserve this convenience, the IXCs strongly oppose any measure that would facilitate the abolition of feature groups.

### B. *Enhanced Service Providers*

The Commission defines enhanced services as

> services, offered over common carrier transmission facilities used in interstate commerce, which employ computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information; provide the subscriber additional, different, or restructured information; or involve subscriber interaction with stored information.

47 C.F.R. § 64.702(a). In simpler terms, an ESP offers data processing services that use the telephone network to transmit information among customers and computers. *California v. FCC,* 905 F.2d 1217, 1223 n. 3 (9th Cir.1990). Familiar examples of enhanced services include "[d]atabase services, in which a customer dials a number to obtain access to stored information, such as Dow Jones News, Lexis, and 'Dial It' sports scores...." *Id.*

Because the BOCs both provide enhanced services themselves and provide local access to other ESPs, the Commission has long been concerned that a BOC might seek to maintain an advantage over competing ESPs by discriminating against them in the provision of local access services. *See Policy and Rules Concerning the Furnishing of Customer Premises Equipment, Enhanced Services and Cellular Communications Services by the Bell Operating Companies, Report and Order,* CC Docket No. 83–115, 95 FCC 2d 1117, 1132–37 (1983). Initially the Commission relied upon a structural safeguard— the requirement that each BOC offer enhanced services only through a separate subsidiary—in order to preclude such discrimination. *Id.* at 1120–21. In 1986, however, the Commission repealed the separate subsidiary requirement and promulgated "non-structural" safeguards against discrimination in access to the local exchange, including a requirement that for each enhanced service a BOC offers it provide a "comparably efficient interconnection" (CEI) to competing ESPs. *Amendment of Section 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry), Report and Order,* CC Docket No. 85–229, 104 FCC 2d 958, 1018–28 (1986) (*Computer III Order*).

At the same time, the Commission noted that several commenters had suggested that service-by-service CEI plans could be avoided if the FCC were instead to require that each BOC develop an "open network architecture" (ONA); this would entail each BOC breaking its access service down into its component parts and offering each so-called basic service element (BSE) separately and upon an equal basis to all ESPs (including, for regulatory accounting purposes, itself). *Id.* at 1059–68. The FCC agreed with this approach, which it thought could both prevent the BOCs from discriminating in the provision of local access and make access for ESPs more efficient. *Id.* at 1063–64. Hence, the Commission set general guidelines for ONA and required each BOC to file an ONA plan setting forth the BSEs it would initially offer. *Id.* at 1064–68. Moreover, the Commission required each BOC to allow other ESPs to participate in the development of its ONA offerings in order to "decrease

the potential for possible discrimination by the [BOC] in designing [BSEs]." *Id.* at 1065–66.

MCI and the Commission agree that the BSEs in the ONA plans originally submitted by the BOCs were primarily just the unbundled components of the services that the BOCs were already offering. The Commission approved those plans in substantial part but required some augmentation; in particular, it directed each BOC to review each other BOC's proposals for additional unbundling ideas and to develop plans for the application of ONA principles to new technologies, such as ISDN (Integrated Services Digital Network). *Filing and Review of Open Network Architecture Plans, Memorandum Opinion and Order,* CC Docket No. 88–2, 4 FCC Rcd 1, 10–17 (1988) (*BOC ONA Order*). The Commission later approved the ONA filings as thus amended, and refused various requests that it require more fundamental unbundling. *Filing and Review of Open Network Architecture Plans, Memorandum and Opinion on Reconsideration,* CC Docket No. 88–2, 5 FCC Rcd 3084 (1990) (*BOC ONA Reconsideration Order*); *Filing and Review of Open Network Architecture Plans, Memorandum Opinion and Order,* CC Docket No. 88–2, 5 FCC Rcd 3103 (1990) (*BOC ONA Amendments Order*). (Shortly after the Commission had approved the amended ONA filings, the Ninth Circuit vacated the FCC's *Computer III* decision, *California v. FCC,* 905 F.2d 1217 (9th Cir.1990), but on remand the FCC reinstated the ONA requirements that it had placed upon the BOCs in the *Third Computer Inquiry* and reaffirmed its earlier approval of the BOCs' amended ONA proposals. *See Computer III Remand Proceedings, Report and Order,* CC Docket No. 90–368, 5 FCC Rcd 7719, 7720 (1990).)

C. *The Part 69/ONA Proceedings*

■ Basic Serving Arrangements (BSAs) are the "fundamental tariffed switching and transmission services that an ESP must obtain to communicate with its customers through the BOC network." *Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subele-*

**1140**

*ments for Open Network Architecture, Notice of Proposed Rulemaking,* CC Docket No. 89–79, 4 FCC Rcd 3983 (1989) (*"ONA NPRM "*). In the *BOC ONA Order,* 4 FCC Rcd at 14, the Commission decided that "[b]ecause persons who provide interstate enhanced services should have the ability to obtain BSEs and BSAs through federal tariffs, we conclude that the BOCs should offer all interstate BSEs in the federal access tariffs to the degree technically possible." The Commission went on to announce that it intended "to initiate a separate rulemaking to amend Part 69 of [its] rules to accommodate such federally-tariffed BSEs and BSAs." *Id.* In May 1989 the Commission accordingly released a notice of proposed rulemaking "to consider how best to integrate [its ONA] tariffing policies into the existing federal access charge rules." *ONA NPRM,* 4 FCC Rcd at 3983. As expected, the *ONA NPRM* addressed almost exclusively questions concerning the changes necessary in order to enable the BOCs to file federal access tariffs for the BSAs and BSEs that they are required to provide to ESPs. In a footnote to the "Background" section of the NPRM, however, the FCC stated that "[u]nder the unbundling we propose, bundled Feature Groups ... such as a 'bundled' form of [Feature Group D] including [Automatic Number Identification] capability would no longer be available." *Id.* at 3991 n. 9. This footnote was appended at a point in the text given over to explaining, by way of example, which services used by ESPs are BSAs and which are BSEs. *Id.* at 3983. In the final rule, the FCC ordered the BOCs to abolish the bundled feature group tariffs that they had been offering to IXCs under the aegis of the *Access Order. Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture, Report and Order,* CC Docket No. 89–79, 6 FCC Rcd 4524, 4528 (1991) (*"Part 69 Order "*).

MCI and other IXCs petitioned the Commission to reconsider this action, which effectively required the IXCs to purchase access under the ONA rules that had been established for ESPs. The IXCs argued that the BOCs should be required to maintain the feature group offerings that they had devel-

oped for the IXCs alongside the unbundled BSAs and BSEs that they were required to develop for ESPs. The IXCs asserted, *inter alia,* that the elimination of feature groups would impose upon them significant conversion costs without any corresponding benefits.

Upon reconsideration, the FCC relented to the extent that it decided to allow, but not to require, the BOCs to continue to offer to the IXCs their existing feature groups in addition to the unbundled service offerings. *Amendments of Part 69 of the Commission's Rules Relating to the Creation of Access Charge Subelements for Open Network Architecture, Memorandum Opinion & Order on Reconsideration,* CC Docket No. 89–79, 8 FCC Rcd 3114, 3115–17 (1993) (*"Part 69 Reconsideration Order"*). MCI and supporting intervenors now petition the court to vacate that decision and to remand the matter to the Commission for further consideration.

## II. ANALYSIS

MCI *et al.* press upon us two main arguments. First, they argue that the proposal to abolish Feature Group D announced in a footnote to the Background section of the *ONA NPRM* did not meet the notice requirement of § 4 of the Administrative Procedure Act, 5 U.S.C. § 553(b). In the context of a rulemaking otherwise devoted entirely to ESPs, they assert that a single footnote to the Background section was insufficient notice of the Commission's intention fundamentally to alter the manner in which IXCs obtain switched access service from the BOCs. Second, they argue that the Commission's ultimate decision is "arbitrary and capricious" on the merits, and therefore substantively unlawful under § 10(e) of the APA. 5 U.S.C. § 706.

### A. *Notice*

The APA requires the Commission to provide notice of a proposed rulemaking "adequate to afford interested parties a reasonable opportunity to participate in the rulemaking process." *Florida Power & Light Co. v. United States,* 846 F.2d 765, 771

(D.C.Cir.1988); *see also* SENATE JUDICIARY COMMITTEE, ADMINISTRATIVE PROCEDURE ACT, S. REP., No. 752, 77th Cong., 1st Sess. 14 (1945) ("Agency notice must be sufficient to fairly apprise interested parties of the issues involved, so that they may present responsive data or argument relating thereto"). This requirement serves both (1) "to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies"; and (2) to assure that the "agency will have before it the facts and information relevant to a particular administrative problem." *National Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C.Cir.1982).

■ The Commission offers three principal arguments in support of the adequacy of the notice it gave in this case. First the agency says that even without the footnote concerning feature groups, "[a]ny interexchange carrier should have recognized that a revision of switched access rules might affect them [sic]...." This claim is utterly unconvincing. The proceedings that gave rise to this rulemaking dealt exclusively with the development of ONA for ESPs. Indeed, when MCI in those proceedings asked the Commission to require the BOCs to develop an ONA for IXCs, the FCC had expressly stated that it would "not require carriers to develop BSEs that satisfy the needs or desires of all segments of the telecommunications industry. Such a requirement would be too broad for the purposes of this proceeding." *Amendment of Section 64.702 of the Commission's Rules and Regulations (Third Computer Inquiry), Memorandum Opinion and Order on Reconsideration*, CC Docket No. 85–229, 2 FCC Rcd 3035, 3050 (1987) (*Computer III Reconsideration Order*).

Neither the Introduction to nor the substantive sections of the *ONA NPRM* did anything to disabuse an interested party of the notion that this proceeding was limited to changing the Part 69 tariff rules to accommodate ONA for ESPs; on the contrary each reinforces that interpretation. The substantive sections focus entirely upon ESPs rather than IXCs. Moreover, the first sentence of the Introduction makes reference to the *BOC ONA Order* and explains that the Commission there expressed the need for a rulemaking to integrate ONA into the federal access charge rules. 4 FCC Rcd at 3983. Because the *BOC ONA Order* indicates that the Commission intended to integrate ONA into the federal access charge rules in order to ensure that "persons who provide interstate enhanced services ... have the ability to obtain BSEs and BSAs through federal tariffs," 4 FCC Rcd at 14, the FCC's reference to that order in the first sentence of the *ONA NPRM* suggests that any change to the federal access charge rules would apply only to ESPs.

This view is reinforced by the fourth sentence of the *ONA NPRM,* in which the Commission states that it "do[es] not believe that major modifications to [its] existing access rules will be necessary to implement such unbundling." 4 FCC Rcd at 3984. Although this statement may have been intended to refer to the scope of the amendments necessary in order to implement ONA unbundling, it gives the impression that the rulemaking would not result in any fundamental change to the existing access rules. By the Commission's own reckoning, however, the IXCs purchase "the vast majority of access," *Part 69 Order,* 6 FCC Rcd at 4528—99 percent according to US West, a BOC; hence, the FCC's decision to extend the requirement of ONA unbundling to the access services offered to IXCs obviously constitutes a major modification of the rules affecting IXCs, and thus would appear to be outside the scope of the proceedings. In short, the history of the ONA proceedings and the entire *ONA NPRM* (with the exception of one footnote) suggest that changes to Part 69 would affect only ESPs.

Second, the Commission suggests that it provided the "alert" reader with adequate notice of its intention in the footnote concerning Feature Group D. Although this court has not unequivocally held that notice is inadequate solely because it is to be found only in a footnote, such placement has been a significant factor in our prior cases holding notice inadequate. *See PPG Indus. Inc. v. Costle*, 659 F.2d 1239, 1250 (1981) ("The importance of the issue was belied by the obscurity of the footnote intended to give notice....");

*cf. McElroy Elec. Corp. v. FCC,* 990 F.2d 1351, 1366 (D.C.Cir.1993) (warning FCC to refrain from practice of putting "heart" of its orders in footnotes). More to the point, however, this court has made it clear that an agency may not turn the provision of notice into a bureaucratic game of hide and seek. *See Small Refiner Lead Phase–Down Task Force v. EPA,* 705 F.2d 506, 550 (D.C.Cir. 1983); *Connecticut Light and Power Co. v. NRC,* 673 F.2d 525, 530 (D.C.Cir.1982); *American Bus Ass'n v. United States,* 627 F.2d 525, 528 (D.C.Cir.1980).

Through its placement of the announcement concerning feature groups, the Commission has practiced just the sort of obscuration that the APA abjures. The problem is not solely that the notice is in a footnote, which is troubling in itself, but also that the footnote in question is a creature of the "Background" section of the NPRM. To make matters worse still, the footnote is appended to a passage that has nothing to do with IXCs: it attempts to explain which services used by ESPs are BSEs and which are included in the BSA. If the Commission were attempting to hide in the most unlikely place its "notice" that the ONA requirement would work to preclude the provision of bundled services to IXCs that want them, it could hardly have done a better job. As Commission counsel acknowledged at oral argument, the purpose of the Background section of an NPRM is to provide some basic information to those who are unfamiliar with the proceedings. It follows that anyone who is already familiar with the proceedings (such as an IXC) would have little reason to study the Background section.

■ We need not speculate, however, upon the question whether the Commission intentionally placed its "notice" in the most obscure possible place, intriguing though it is; the agency's intent is beside the point. The question is whether the notice was "adequate to afford interested parties a reasonable opportunity to participate in the rulemaking process." *Florida Power & Light Co.,* 846 F.2d at 771. In this case it was not. *See National Air Transp. Ass'n v. McArtor,* 866 F.2d 483, 485 (D.C.Cir.1989) (discussing the importance of subject-matter headings in

guiding reader of agency publications, and warning that notice may be inadequate when placed in section that interested party is unlikely to read); *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1322–23 (D.C.Cir.1988) (finding notice inadequate where relevant issue was raised only in "Supplemental Information" section of notice and admonishing that "[a]n agency may not introduce a proposed rule in such a crabwise fashion").

The Commission's last line of defense is to claim that such notice as it gave must have been adequate because at least a few parties to the rulemaking did in fact comment upon the question whether feature groups used by IXCs should be unbundled. We have repeatedly held, however, that each interested party is not required to monitor the comments filed by all others in order to get notice of the agency's proposal; hence, the comments received do not cure the inadequacy of the notice given. *American Fed'n of Labor v. Donovan,* 757 F.2d 330, 340 (D.C.Cir.1985); *Small Refiner Lead Phase–Down Task Force,* 705 F.2d at 550.

Insofar as the agency means to show that despite the inadequacy of its notice, the parties had actual notice of its proposal, *see Small Refiner Lead Phase–Down Task Force,* 705 F.2d at 549—which one party might well get from the comments of another party—the Commission has not demonstrated that that occurred here. The FCC points to nothing in the comments of two of the intervenors, Allnet Communication Services, Inc. and Competitive Telecommunications Association, to indicate that they had actual notice of the agency's intentions to relax the requirement that the BOCs continue to offer the bundled feature groups used by the IXCs.

Moreover, MCI also asserts that it did not have actual notice of the FCC's intentions, and its comments bear this out. MCI did in its comments ask the Commission to "be alert to attempts by the BOCs to unnecessarily unbundle existing access features," and it urged that "the Commission should not permit the BOCs to use ONA as an excuse for unbundling, restructuring or otherwise manipulating the rates of Feature Group D

access service at this time." In context, however, those comments are clearly of a precautionary nature; they address only the question of how the FCC should respond if the BOCs were to propose to dismantle or rearrange their feature groups. They make no mention of, nor even implicit reference to, the lone footnote in the NPRM concerning Feature Group D or the comments of any other party concerning that footnote. On the contrary, MCI's comments suggest that it did not realize that the Commission intended to take the initiative in deciding the future of feature groups for IXCs.

Of the four IXC parties before the court, only Sprint clearly had actual notice of the proposal, which it got not from the NPRM but from informal *ex parte* communications with the Commission's staff. By providing inadequate notice to the public and later—through a back channel—informing a single party of its intentions, the Commission arrogated to itself the power to determine who would have the opportunity to comment upon its proposal. This is decidedly not how the notice and comment requirement of the APA is supposed to work. Moreover, even if we credit the Commission with having demonstrated that Sprint had actual notice of the Commission's intentions, this is insufficient because the Commission has failed to demonstrate that the other three IXC parties before the court had actual notice. *See Donovan,* 757 F.2d at 339–40 (refusing to conclude, based upon comments filed by one party, that all parties before court had actual notice); *Wagner Elect. Corp. v. Volpe,* 466 F.2d 1013, 1019–20 (3rd Cir.1972). Because the Commission's decision to allow the BOCs to discontinue offering bundled feature groups to IXCs was not preceded by adequate notice, we vacate that decision and remand the matter to the agency for such further proceedings as it may wish to conduct in compliance with the requirements of the APA.

### B. *The Merits*

MCI and the supporting intervenors also argue that the Commission's decision to allow the BOCs to discontinue offering bundled feature groups for IXCs is substantively arbitrary and capricious. They advance a number of arguments in support of this claim, of which two are particularly troubling. First, they contend that the Commission failed adequately to explain how allowing the BOCs to discontinue offering bundled feature groups for IXCs that want them would promote the agency's stated goal of achieving a more fundamental unbundling of LEC access services. Second, the IXCs argue that the Commission failed adequately to address the evidence they submitted to show that they would incur substantial conversion costs if the BOCs stopped offering bundled feature groups.

The Commission's handling of these critical issues in the *Part 69 Order* and the *Part 69 Reconsideration Order* is indeed conclusory, leaving us with little to allay the serious concerns that the IXCs have raised. Because we hold that the decision to allow the BOCs to discontinue bundled feature groups for IXCs is invalid for want of public notice, however, we need not now decide whether the Commission's decision is arbitrary and capricious on the merits. *See Reeder v. FCC,* 865 F.2d 1298, 1305 (D.C.Cir.1989) (deciding not to address merits of agency rule held invalid on notice grounds); *American Fed'n of Labor v. Donovan,* 757 F.2d at 340 n. 6; *PPG Indus., Inc. v. Costle,* 659 F.2d at 1250 (same). We pause, however, to note that the conclusory manner in which the Commission dealt with these important issues only points up the importance of providing the public with adequate notice and opportunity to comment. On a more developed record, we presume that the FCC will account more convincingly for whatever decision it ultimately makes.

### III. CONCLUSION

Because the Commission provided inadequate notice of its decision to allow the BOCs to discontinue offering feature groups to IXCs, we grant the petition for review, vacate the order in relevant part, and remand this matter for further proceedings not inconsistent with this opinion.

*So ordered.*