99 F.3d 1170
 43 ERC 1769, 321 U.S.App.D.C. 319, 27
Envtl. L. Rep. 20,444
 NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION, et al., Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Environmental Technology Council, Inc. and American Iron and
Steel Institute, Intervenors.
 No. 94-1752.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 11, 1996.
Decided Nov. 8, 1996.
Rehearing Denied Jan. 15, 1997.
 
 On Petition for Review of an Order of the Environmental Protection Agency.
 Norman L. Rave, Jr., Washington, DC, argued the cause for petitioners, with whom Toni K. Allen and Steven S. Rosenthal were on the joint briefs. Timothy S. Hardy entered an appearance.
 Paul E. Gutermann, John N. Moore and Neil J. King, Washington, DC, were on the joint brief for petitioners Horsehead Resource Development Company, Inc. and The International Metals Reclamation Company, Inc.
 Alice L. Mattice, Attorney, U.S. Department of Justice, argued the cause for respondent, with whom Lois J. Schiffer, Assistant Attorney General, and Steven Silverman, Attorney, Environmental Protection Agency, were on the brief.
 Before: SILBERMAN, GINSBURG and ROGERS, Circuit Judges.
 ROGERS, Circuit Judge:
 
 
 1
 Petitioners National Electrical Manufacturers Association and Utility Solid Waste Activities Group (collectively "NEMA") challenge a final rule of the Environmental Protection Agency ("EPA") imposing land disposal restrictions on hazardous soils, on the ground that it was promulgated without adequate notice and opportunity for comment. Specifically, NEMA maintains that the notices in the federal register concerning the proposed rule were misleading and caused NEMA to forego its opportunity to comment on the application of the treatment standards to soils. NEMA asserts that the multiple notices amounted to a "bait and switch" that confused the regulated community and failed to indicate how soils would be affected by the final rule. Because we conclude that NEMA received adequate notice that the disposal restrictions would apply to soils absent the promulgation of alternative standards, we deny the petition for review.[1]
 
 I.
 
 2
 The "Land Disposal Restrictions Phase II--Universal Treatment Standards, and Treatment Standards for Organic Toxicity Characteristic Wastes and Newly Listed Wastes," 59 Fed.Reg. 47,982 (1994), set standards under the Resource Recovery and Conservation Act ("RCRA"), 42 U.S.C. § 6901, et seq., for the land disposal of toxic organic chemicals that are capable of migrating into the surrounding environment. Under RCRA, hazardous waste to be disposed on land must comply with a treatment standard that assures that "short-term and long-term threats to human health and the environment are minimized." Id. § 6924(m). Pursuant to a consent decree between EPA and the Environmental Defense Fund, EPA was obligated to promulgate land disposal restrictions ("LDRs") that would apply to all forms of waste no later than July 1994. See id. § 6924(g)(5). The consent decree did not require the promulgation of standards governing the treatment of contaminated soils. See 59 Fed.Reg. 10,779 (1994). NEMA challenges EPA's interim decision to apply the universal LDRs to contaminated soils.
 
 
 3
 EPA classifies hazardous wastes as either "listed" wastes, meaning that they are specifically named at 40 C.F.R. §§ 261.31-33 (1994), or as "characteristic" wastes, meaning that they display at least one of the following four features: ignitability, corrosivity, reactivity, or toxicity. Id. §§ 261.21- 24. The final rule applies to soils contaminated with "characteristic" wastes ("TC-organic soils"). In the past, EPA recognized that RCRA waste treatment standards are often impracticable as applied to contaminated soils. See 55 Fed.Reg. §§ 8,666, 8,760 (1990). In particular, the agency has recognized that combustion, although the most effective method for treating certain types of wastes, is a difficult and costly approach to treating large quantities of soil with low levels of contamination. Accordingly, EPA has adopted a liberal policy of granting treatability variances for soil disposal. See id. at 8,760-61.
 
 
 4
 Cognizant of the particular demands of soil treatment, in the first notice of proposed rulemaking of September 14, 1993, EPA set forth both universal standards to meet the requirements of the consent decree and "alternative standards for soil contaminated with prohibited hazardous wastes that will encourage use of noncombustion treatment technologies in treating hazardous soil." 58 Fed.Reg. 48,092 (1993). The notice identified three possible approaches to the development of alternative soil standards that would apply to all hazardous soils, including TC-organic soils. Id. at 48,096.
 
 
 5
 EPA's second notice was a notice to extend comment on November 12, 1993. Three days prior to the scheduled close of the comment period for the proposed rule, the second notice postponed the deadline for comments concerning the alternative soil standards for four months, until March 15, 1994. 58 Fed.Reg. 59,976 (1993). EPA explained that the extension was granted in response to comments identifying potential overlap between the soil standard-setting process and another rulemaking initiative then underway, known as the Hazardous Waste Identification Rule ("HWIR"). Id. at 59,976-77. The notice stated that the HWIR process involved a public dialogue including the States, industry, and public interest groups, and that the participants had arrived at a potential conceptual framework for regulating the management of contaminated media, including soils, generated during cleanup. Id. at 59,977. EPA explicitly stated, however, that if the specialized soil standards were not yet settled by the time the universal LDRs had to be completed, soils would be subject to the universal standards. Id.
 
 
 6
 In a third notice issued on March 8, 1994, seven days prior to the close of the extended comment period, EPA clarified that the portion of the proposed rule of September 14, 1993, that dealt with alternative treatment standards for contaminated soil, would not be promulgated along with the remainder of the LDR rules, and would instead be addressed later as part of the HWIR process. 59 Fed.Reg. 10,778 (1994). The third notice also expressly stated that because the HWIR alternatives would not be complete by the July 1994 deadline, soils would be subject to the universal standards once they were promulgated. Id. at 10,779.
 
 II.
 
 7
 NEMA contends that EPA's failure to provide adequate notice and opportunity for comment before imposing the LDRs on TC-organic soils violated the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b)-(c).[2] To meet the requirements of § 553, an agency "must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully." Florida Power & Light Co. v. United States, 846 F.2d 765, 771 (D.C.Cir.1988), cert. denied, 490 U.S. 1045, 109 S.Ct. 1952, 104 L.Ed.2d 422 (1989). Final agency regulations need not mirror exactly those originally proposed. "To avoid 'the absurdity that ... the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary' ... final rules need only be a 'logical outgrowth' of the proposed regulations." Shell Oil Company v. EPA, 950 F.2d 741, 750-51 (D.C.Cir.1991) (internal quotations and citations omitted). If the final rule deviates too sharply from the proposal, however, the affected parties will be denied adequate notice and opportunity to comment. See Am. Fed'n of Labor v. Donovan, 757 F.2d 330, 338-39 (D.C.Cir.1985).
 
 
 8
 Considered in combination, EPA's three notices made clear to the regulated community EPA's intent to impose the universal standards on soils. The September 14, 1993, notice of proposed rulemaking on both the universal LDRs as well as the alternative soil treatment standards stated that "[i]n order to comply with the LDR's, hazardous soil would have to be treated either to meet the standards for the hazardous waste contaminating the soil, or the alternative treatment standards proposed in the notice." 58 Fed.Reg. at 48,096 (emphasis added). EPA also stated in the notice that "the universal treatment standards ... are proposed for soil as 'base' standards" from which more flexible soil-specific variations would be derived. Id. While signaling that alternative treatment standards would be available, the phrasing of the notice, including the use of the word "either," made clear that soils would not be entirely exempted from the universal standards. Although this sentence could be read to give parties a choice between the universal and alternative standards, it also indicates that if the alternatives were for some reason unavailable, the universal standards would have to be satisfied. Therefore, if interested parties objected to the imposition of the universal standards on soils, they could have filed comments with EPA, arguing that there were no circumstances under which those standards appropriately could be imposed upon soils. While NEMA may have concluded that the availability of alternative treatment standards would obviate any scenario in which soils were subject to the universal standards, its assumption was speculative and does not undercut EPA's clear notice that the universal standards might be applied to contaminated soils.
 
 
 9
 The subsequent two notices of November 12, 1993, and March 8, 1994, confirmed that if the alternative standards were delayed, the universal rules would apply to soils in the interim. In the second notice of November 12, 1993, EPA alerted interested parties that the soil standards entailed considerations beyond those in the universal rule and that those standards needed to be coordinated with the HWIR proceeding. 58 Fed.Reg. 59,976-77. While extending the comment period until March 1994 did not necessarily dictate that the soil proposals would not be finalized by the July 1994 LDR deadline, the notice did indicate that substantial discussion was still required on various aspects of the soil standards. Id. at 59,977. Most important, EPA expressly stated that
 
 
 10
 [i]n the event that an alternative framework for regulating the management of hazardous soils has not been developed by the Phase II settlement agreement date, (i.e. July 31, 1994), then the LDR treatment standards developed for the Phase II wastes will also apply to soils that contain these wastes, as has been the case in previous LDR rulemakings.
 
 
 11
 Id.
 
 
 12
 NEMA maintains, however, that the clear notice of November 12, 1993, was clouded by EPA's March 8, 1994, clarification, in which EPA announced that the soil standards would not be completed in time to be promulgated along with the remainder of the proposed rule. The third notice stated that "those provisions of the September 14, 1993, proposal addressing treatment standards for contaminated soil will not be promulgated with the remaining portions of the LDR rules proposed in September, 1993." 59 Fed.Reg. 10,778. NEMA contends that it was justifiably misled by this statement and that it reasonably concluded that EPA would not promulgate any standards affecting soils in the July 1994 LDR rulemaking. But, as EPA points out, the third notice indicated only that the alternative soil treatment standards would be delayed and did not alter the fact, as stated in the initial notice of proposed rulemaking on September 14, 1993, that, in the absence of alternatives, the universal standards would apply to soils. In the third notice, EPA explicitly stated that the delay would not affect the applicability of the universal standards to soils:
 
 
 13
 It should be understood that by deferring these provisions of the LDR proposal to the HWIR rulemaking effort, hazardous soils will continue to be subject to the LDR standards that apply to the hazardous wastes with which the soils are contaminated. When the LDR rules that were proposed in September, 1993 are finalized, the LDR treatment standards that apply to the wastes addressed in that rule will also apply to soils that contain those wastes, as has been the case in previous LDR rulemakings.
 
 
 14
 Id. at 10,779.
 
 
 15
 Although this statement makes plain EPA's intent to apply the universal standards to soils pending resolution of the HWIR process, NEMA claims to have construed this language to apply only to soils contaminated with listed wastes rather than to TC-organic soils. It maintains that EPA's reference to wastes that would "continue to be subject" to the LDRs logically could refer only to wastes already listed under RCRA, not to previously unregulated TC-organic wastes. Assuming the reference to wastes "continu(ing)" to be subject to the restrictions is ambiguous, the following sentence in the March 8 notice, which states that the new treatment standards "will also apply to soils," is straightforward. Neither sentence refers expressly to soils contaminated with "listed wastes"; nor is there anything in the notice that would enable a party reliably to impute such a limitation. In addition, because EPA indicated its intent to apply the universal standards to soils pending completion of alternatives in the second notice of November 12, 1993, absent a clear indication that EPA policy had changed, interested parties were on notice that those standards might go into effect if the alternative soil rulemaking was delayed.
 
 
 16
 It is true that the third notice of March 8, 1994, appeared only a week before the deadline for comments on the soil standards. NEMA does not contend specifically, however, that the tight deadline did not afford "interested parties a reasonable opportunity to participate in the rulemaking process." Florida Power & Light, 846 F.2d at 771. Nor is there any indication in the record that NEMA requested additional time from EPA to enable it to comment on the March 8 notice. Rather, NEMA contends that despite the clear language of the second notice of November 12, 1993, it did not understand that the universal standards might be applied to soils. In comments filed in response to the September 14, 1993, notice of proposed rulemaking, NEMA referred to concerns about the soil standards and stated that because the comment period for these segments of the rule had been extended, it would address these issues at a later date. In comments submitted after the third notice of March 8, 1994, NEMA again did not discuss the application of the universal standards to soils. When members of a regulated industry decline an opportunity to comment upon an administrative regulation of direct interest to them, it may suggest that the agency's intentions were unclear. Here, however, any misapprehension by NEMA would have been alleviated by a careful reading of the plain language of EPA's notices.
 
 
 17
 Accordingly, we conclude that EPA provided adequate notice and opportunity to comment, fulfilling the dual purposes of the APA's notice and comment requirements. See MCI Telecommunications Corp. v. FCC, 57 F.3d 1136, 1141 (D.C.Cir.1995) (stating that the APA notice and comment provisions serve two purposes: "(1) to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies; and (2) to assure that the agency will have before it the facts and information relevant to a particular administrative problem.").[3] NEMA has indicated that it will take advantage of the opportunity to comment on the proposed alternative treatment standards under review in the HWIR rulemaking process, and thus will not be deprived of the chance to participate in the final rulemaking on the alternative soil standards. In addition, EPA's motivation behind imposition of the universal standards on soil was to provide environmental protection in the short term so as to ensure that the formulation of the soil alternatives would receive thorough consideration and would be informed by facts and perspectives being gathered in the HWIR process. Under these circumstances, upholding the final rule would not undermine the objectives of ensuring public participation or of promoting informed agency action. We, therefore, deny the petition for review.
 
 
 
 [1]
 NEMA also contends that, as applied to soils, the land disposal restrictions are arbitrary and capricious. Because NEMA failed to raise this issue in comments before the agency, and the American Petroleum Institute, which filed comments in response to the agency's notices, noting that the land disposal restrictions would apply, also did not argue that the agency's action was arbitrary and capricious, the contention is waived and we do not reach its merits in this appeal. See Ohio v. EPA, 997 F.2d 1520, 1528 (D.C.Cir.1993); Linemaster Switch Corp. v. EPA, 938 F.2d 1299, 1308 (D.C.Cir.1991); Washington Ass'n for Television & Children v. FCC, 712 F.2d 677, 680 (D.C.Cir.1983)
 
 
 [2]
 The APA provides in relevant part:
 (b) General notice of proposed rule making shall be published in the Federal Register ... The notice shall include ... (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
 (c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments....
 
 
 [3]
 NEMA's reliance on MCI Telecommunications is misplaced. In MCI Telecommunications, the only warning given to long distance carriers of a proposed rule with far-reaching implications for their operations was contained in a single footnote to the background section of a notice directed to a different type of regulated entity, enhanced services providers. The court held that "an agency may not turn the provision of notice into a bureaucratic game of hide and seek" and that the buried notice in question represented "just the sort of obscuration that the APA abjures." 57 F.3d at 1142. By contrast, NEMA did not confront a game of hide-and-seek, but rather a series of notices whose plain language set out EPA's intentions