**LOUISIANA FEDERAL LAND BANK ASSOCIATION, FCLA, et al., Plaintiffs,**

v.

**FARM CREDIT ADMINISTRATION, et al., Defendants.**

No. Civ.A.00–1582(RMU).

United States District Court, District of Columbia.

Aug. 23, 2001.

Daniel Mordecai Joseph, Beth Lea Hirschfelder, Akin, Gump, Strauss, Hauer & Feld, L.L.P., for plaintiffs.

Marcia Kay Sowles, U.S. Dept. of Justice, Civ. Div., Washington, DC, for Farm Credit Admin., U.S., defendants.

Nels John Ackerson, Kathleen C. Kauffman, Ackerson Group, chartered, Washington, DC, for First South Production Credit Ass'n, intervenor–defendant.

John Louis Oberdorfer, Patton Boggs, L.L.P., Washington, DC, for AGFIRST Farm Credit Bank, movant.

### *MEMORANDUM OPINION*

URBINA, District Judge.

**Granting the Defendants' Motion for Summary Judgment; Denying the Plaintiffs' Motion for Summary Judgment**

### I. INTRODUCTION

This matter comes before the court on cross-motions for summary judgment. The plaintiffs, Farm Credit Bank of Texas ("FCB–Texas") and others,[1] seek a declaratory judgment that a regulation ("the Final Rule") promulgated by the defendant,

---

**1.** The court will refer to the plaintiffs as FCB–Texas. The plaintiffs include the following associations: Louisiana Federal Land Bank Association, FLCA; Federal Land Bank Association of North Mississippi, FLCA; Federal Land Bank Association of South Mississippi, FLCA; Federal Land Bank Association of North Alabama, FLCA; and Federal Land Bank Association of South Alabama, FLCA.

the Farm Credit Administration ("FCA"), is invalid. The Final Rule repealed existing FCA regulations that required Farm Credit System ("System") lending institutions to obtain consent from other System institutions when purchasing participation interests made by a non-System lender located outside the purchasing lender's chartered territory. The plaintiffs assert that the removal of the consent requirement: (1) violates the Farm Credit Act of 1971; (2) violates the 1992 amendments to the Farm Credit Act; (3) causes harm to the Farm Credit System, its borrowers and stockholders; (4) is invalid because the FCA failed to respond to significant comments to the Proposed Rule; (5) was promulgated by the FCA without providing sufficient notice of the substance of the regulation; and (6) is arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* *See* Compl. ¶¶ 64–76.

After careful consideration of the parties' submissions, the relevant law and the entire record herein, the court concludes that the defendants are entitled to judgment as a matter of law. Accordingly, the court will grant the defendants' motion for summary judgment and deny the plaintiffs' motion for summary judgment.

## II. BACKGROUND

### A. The Farm Credit System

The Farm Credit System is a nationwide network of federally chartered, borrower-owned banks and lending associations. Established by Congress in 1916, the express goal of the Farm Credit System is to "improv[e] the income and well being of American farmers and ranchers by furnishing sound, adequate, and constructive credit ... to them." 12 U.S.C. § 2001(a). The Farm Credit Administration is an independent, executive-branch agency designed to oversee the Farm Credit System and administer the Farm System Act by prescribing necessary rules and regulations. *See* 12 U.S.C. § 2252(a)(9). Since its inception, Congress has revamped the Farm Credit System several times, introducing major revisions in 1971 and the mid–1980s in response to the agricultural financial crisis in the United States.[2]

The current Farm Credit System is comprised of six Farm Credit Banks, one Agricultural Credit Bank, and about 158 local associations. Through the local associations, the banks provide credit to eligible borrowers for agricultural and rural housing needs. *See* 12 U.S.C. §§ 2013, 2017, 2075, 2093 and 2279b. The statutes governing the System designate the type of loans each local association can make: Federal Land Bank Associations provide long-term loans; Production Credit Associations provide short- and intermediate-term loans; and Agricultural Credit Associations provide short-, intermediate-, and long-term loans.[3] *See* 12 U.S.C. §§ 2071, 2091, 2279b and 2279c–1.[4] Each System

---

**2.** These changes resulted in the following laws: The Farm Credit Act of 1971, Pub.L. No. 92–181, 85 Stat. 583; The Farm Credit Amendments Act of 1985, Pub.L. No. 99–205, 99 Stat. 1678; The 1986 Farm Credit Amendment, Pub.L. No. 99–509, 100 Stat. 1874; and the Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1568.

**3.** Agricultural Credit Associations are the result of voluntary mergers between Production Credit Associations and Federal Land Bank Associations. The Agricultural Credit Act of 1987 authorizes these mergers. *See* Pub.L. No. 100–233, 101 Stat. 1568.

**4.** Pursuant to 12 U.S.C. §§ 2021 and 2279b, Federal Land Bank Associations act as agents for the Farm Credit Banks that they are affiliated with for the making of long-term loans. If authority to make such loans is transferred from the Farm Credit Bank to the Federal

institution is jointly and severally liable for the acts of other System institutions. *See, e.g.,* 12 U.S.C. §§ 2155(a)(1), 2096 and 2153(c)–(d). In addition, a farmer or rancher must purchase voting stock in his local association before receiving a loan from that association. *See* 12 U.S.C. § 2154a(c)(1). This feature not only ensures that the ranchers and farmers control some institutional decisions, but also that they remain eligible to receive more favorable terms of credit. *See id.; see also* Compl. ¶ 19.

Critical to the instant matter was Congress's move to consolidate the Farm Credit System in the mid–1980s. In 1987, Congress passed the Agricultural Act, which "both require[d] and encourage[d] institutions of the Farm Credit System to reorganize in order to better serve their farmer and cooperative members and cut costs." Pub.L. No. 100–233, 101 Stat. 1568 (1987); 133 Cong.Rec. S18, 459 (daily ed. Dec. 19, 1987) (remarks of Sen. Leahy, presenting the conference report). Section 401(a) of the 1987 Act mandated the mergers of Federal Land Banks and Federal Intermediate Credit Banks in each district to form Farm Credit Banks by July 6, 1988. *See* 12 U.S.C. § 2011 note.

The section 401(a) mergers occurred in every farm credit district except the Fifth Farm Credit District, located in Jackson, Mississippi. No merger occurred in Jackson because the FCA placed the Federal Land Bank of Jackson into receivership on May 20, 1988. In response to the Jackson Bank's failure, the FCA solicited bids from other System institutions for the purchase of the Jackson Bank's assets. *See* Compl.

¶ 21. FCB–Texas successfully bid for those assets, but conditioned its bid and acceptance of the loan obligations on FCA approval of an amendment to FCB–Texas's charter. The proposed amendment to the charter gave FCB–Texas territorial servicing rights in Alabama, Mississippi, and Louisiana. *See id.* at 23. The FCA accepted the bid and the charter amendment on February 10, 1989. *See id.* at 21.

As a result of FCB–Texas's acquisition of the failed bank, the FCA ordered a Section 401(a) merger between the Federal Intermediate Credit Bank in Jackson and FCB–Texas. Both the ordered merger and approved charter amendment were challenged in federal court by First South PCA, the Jackson Federal Intermediate Credit Bank and FCB–Wichita. The Fourth Circuit held that the FCA could not require such a merger under section 401(a). *See First South Production Credit Ass'n v. Farm Credit Admin.,* 926 F.2d 339, 347 (4th Cir.1991).

The Court's refusal to allow a merger in Jackson left a three-state gap in the Farm Credit System. As the Court noted, "if there truly is a three-state gap ... then Congress may amend the statute to close it." *First South,* 926 F.2d at 346. In response to the Court's holding, Congress amended the Farm Credit Act of 1971 to recognize FCB–Texas's charter as "exclusive" for long-term lending in Alabama, Mississippi and Louisiana.[5] *See* § 401(b); Compl. ¶ 24. In addition, Congress prohibited the FCA from authorizing other System institutions to "exercise lending authority" in the former Jackson district unless the stockholders and boards of di-

---

Land Bank Association, the Federal Land Bank Association becomes known as a Federal Land *Credit* Association or a "direct lender." Production Credit Associations make short- and intermediate-term loans with funds from the Federal Credit Bank with which they

are associated. *See* 12 C.F.R. § 619.9155 (2000).

**5.** Farm Credit Banks and Associations Safety and Soundness Act of 1992, Pub.L. No. 102–552, 106 Stat. 4102 (1992).

rectors of the System institutions currently chartered to lend there approved of such lending. *See* 12 U.S.C. §§ 2252(a)(2)(B)–(C); Compl. ¶ 26.

The plaintiffs contend that the Final Rule violates both of these amendments to the Farm Credit Act. *See* Compl. ¶¶ 67–68. The defendants respond that the regulation of participation lending is not a chartering action that would run afoul of § 2252(a)(2)(B)–(C) and therefore is well within their regulatory authority. *See* Defs.' Mot. to Dismiss at 17–18. In addition, the defendants argue that 12 U.S.C. §§ 2252(a)(2)(B)–(C) does not give the plaintiffs veto power over their regulations, because no other System institution possesses such veto power. *See id.* at 19–20.

## B. Participation Authority

The Farm Credit Act authorizes System institutions to make loans in two ways: either directly or by "participating" in loans made by other institutions. In a "participation" loan, one financial institution makes a loan to a borrower and then sells or "allots" a portion or "interest" of the loan to one or more participants. *See* Charles Woelful, *Encyclopedia of Banking and Finance* 888 (10th ed.1994). These participations generally take the form of a two-party contract such as the following:

(i) the Selling Bank, having recited the fact that it has made a described loan to company X, "allots" a participation to the Purchasing Bank, usually expressed in terms of a percentage of principal and interest; (ii) the Selling Bank undertakes to service the loan i.e., to receive the payments of principal and interest and to remit the prescribed percentages thereof to the Purchasing Bank; (iii) the Selling Bank makes certain express representations and warranties to the Purchasing Bank; (iv) the Purchasing Bank

undertakes to pay the Selling Bank the Purchasing Bank's percentage of the loan; (v) the Selling Bank sets forth the standard of care that it will use in servicing the loan . . .; and (vi) the parties negotiate any additional required provisions . . . .

Patrick J. Ledwidge, *Loan Participation Among Commercial Banks,* 51 Tenn. L.Rev. 519, 520–21 (1984). Before 1980, System lenders were allowed to participate only in loans with other System lenders. In 1980, however, Congress enlarged the scope of permissible participation loans to encompass non-System institutions. *See* Farm Credit Act Amendments of 1980, Pub.L. No. 96–592, 94 Stat. 3437 (1980). Farm Credit Banks may now participate in loans with non-System institutions so long as they are "loans that the bank is authorized to make under this subchapter." 12 U.S.C. § 2013(12)(C).

## C. Geographic Restrictions

Before 1992, the Farm Credit Act contained no explicit geographic restrictions on lending. Nevertheless, the FCA used its broad grant of regulatory power to charter and structure institutions in a way that promoted exclusive territories. *See* 63 Fed.Reg. 60, 219. Historically, the FCA issued charters granting each System institution a particular geographic "territory" and requiring, by regulation, the consent of affected System institutions for out-of-territory loans. *See* 12 C.F.R. § 614.4070. In 1983, the FCA adopted regulations that placed the same geographic restrictions on loan participations as existed for direct lending. *See* 48 Fed.Reg. 54, 473 (1983).

In response to economic developments, however, including consolidations in both the financial-services markets and the agricultural sector, the FCA began to loosen its traditional adherence to territorial lend-

ing. *See* 63 Fed.Reg. 60, 219–220. For example, all banks governed by Title III of the Farm Credit System[6] now operate on a national scale, enabling them to provide cooperative customers with a choice of lenders. *See id.*

In 1994, Congress gave Farm Credit Banks and direct-lender associations authority to participate in loans with "similar entities," subject to percentage limitations.[7] *See* 12 U.S.C. § 2206a (1994). In implementing this law, the FCA regulations did not require any out-of-territory consent by Farm Credit Banks or associations. *See* 12 U.S.C. § 2206a (1994); 12 C.F.R. § 613.3000(d)(2)–(3) (2000).

### D. The Proposed Rule

On November 8, 1998, the FCA published a Proposed Rule eliminating all geographic restrictions on lending, related services, and certain loan participations. *See* 63 Fed.Reg. 60, 219–22 (Nov. 8, 1998); Admin. Record ("AR") 476–479 (the "Proposed Rule"). The FCA characterized the Proposed Rule as the "first major step to implement the FCA Board's Philosophy Statement on Intra–System Competition." *See* Supp.Info. to Proposed Rule at 2.[8] The Proposed Rule eliminated provisions in existing regulations that required institutions

to acquire the notice and consent of affected institutions before engaging in out-of-territory lending. These restrictions, according to the FCA, "have become burdensome to both borrowers and System institutions." *See* 63 Fed.Reg. at 60, 219. The removal of these restrictions would allow System institutions to "increase operating efficiencies and offer better service to creditworthy and eligible borrowers." *Id.*

The preamble to the Proposed Rule highlighted "customer choice" as its primary rationale and anticipated benefit. *See* 63 Fed.Reg. at 60, 219. To this end, the proposed amendments to section 614.4070(b) would allow borrowers "to seek financing and related services from any association or [System] bank operating under Title I or II of the Act." *Id.* The preamble also drew attention to the fact that the Proposed Rule not only removed the notice and consent requirements from direct loans but also "allow[ed] a bank or association to extend credit, *participate in loans,* and provide related services to any eligible applicant under its respective Title I or II authorities." *Id.* (emphasis added). According to the preamble, many banks within the agricultural lending system had a "high concentration of loans in only a few agricultural commodities" and were vul-

---

**6.** Chapter 23 of the United States Code governs the Farm Credit System. The Chapter is divided into eight subchapters, with Subchapter I governing the Farm Credit Banks, Subchapter II governing the Farm Credit Associations and Subchapter III governing Banks for Cooperatives. These subchapters are identical to the Titles contained in the Farm Credit Act Amendments of 1980, Pub.L. No. 96–582, 94 Stat. 3437 (1980). Thus, System banks often are referred to in both legislation and regulation by the Title or subchapter under which they were established.

**7.** Title 12 U.S.C. § 2206a(a)(2)(A) defines "similar entities" as "a person that is not eligible for a loan from the Farm Credit Bank or association."

**8.** In its Philosophy Statement on Intra–System Competition of July 1998, the FCA board stated that "unrestricted intra-System competition is beneficial for the consumer and the long-term relevancy of the Farm Credit System." The board also iterated its support for "[r]emoval of geographical boundaries of System entities" and for "[b]road interpretation of existing statutes which will enable Farm Credit System institutions to become more competitive; and in the absence of statutory authority, considering legislative solutions." FCA–PS–73 Philosophy on Intra–System Competition, NV 98–30 14 Jul 98.

nerable to "fluctuations in commodity prices and downturns in the agricultural economy." *Id.* With the Proposed Rule, the FCA attempted to respond to these problems by allowing the "[b]uying and selling [of] participations in loans with other [System] institutions and lenders in other regions to the country [to] help institutions diversify their loan portfolios and limit their exposure to risk in a single commodity and in a specific geographic area." *Id.* Reducing the obstacles to loan participation and allowing banks to diversify their loan portfolios would maximize the "safety and soundness" of the System. *See id.*

### E. Comments

The Administrative Procedure Act's public-comment requirement for rule-making states that "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). In accordance with this requirement, the FCA allowed a six-month public-comment period for its Proposed Rule during which it received more than 270 comment letters. *See* 65 Fed.Reg. 24, 201 (Apr. 25, 2000); AR 4. In its preamble to the Final Rule, the FCA noted that no commentator had cited any statutory provision that restricted the authority of System institutions to participate in loans outside their chartered territory. *See id.* In fact, only the comment letter submitted by the plaintiffs mentioned the statutory authority of System institutions to participate in loans. *See id.;* AR 177, 182–83.

The plaintiffs argue that every comment that challenged the Proposed Rule must be deemed a challenge to all aspects of the rule, including the provisions of the rule dealing specifically with loan partic-

ipations. *See* Pls.' Mot. for Summ.J. at 25–26. The defendants, by contrast, assert that the letters addressed issues relating only to direct lending, not loan participation. *See* Defs.' Reply at 22. The defendants concede that two of the letters raised concerns about the Proposed Rule's effect on a borrower's choice of lender, but they argue that these concerns cannot be deemed related to loan participation because loan participation does not involve any choice of lender by the borrower. *See id.* at 24.

### F. The Final Rule

The FCA published the Final Rule in the Federal Register on April 25, 2000. *See* 65 Fed.Reg. 24, 101 (2000). The Final Rule specifically "repeal[ed] the notice and consent requirements that apply to loan participations between Farm Credit and non-System lenders." *See id.* According to the FCA's publication in the Federal Register, by allowing System lenders to "diversify geographic and industry concentrations in their loan portfolios," the Final Rule accomplishes many of the goals stated in the Proposed Rule. *See id.* In turn, the "[c]ooperation among System and non-System lenders can increase agricultural credit availability, particularly during downturns in the economic cycle." *Id.*

Unlike the Proposed Rule, the Final Rule "does not authorize direct lender associations to exercise lending authority outside their chartered territory without consent." *Id.* at 24,102. This language eliminates from the Proposed Rule any changes to 12 C.F.R § 614.4070 and narrows the scope of the Final Rule to loan participations only. Consequently, the Proposed Rule and Final Rule differ with respect to the type of activity being regulated. The Proposed Rule sought to alter regulations governing both participation lending and direct lending and related ser-

vices. The Final Rule, however, alters only regulations governing participation lending. It is this adjustment that the plaintiffs claim: (1) violates the Farm Credit Act of 1971 and its 1992 amendments; (2) is arbitrary and capricious; and (3) is invalid because the FCA failed to respond to significant comments and failed to provide sufficient notice of the substance of the regulation. *See* Compl. ¶¶ 64–76.

On June 30, 2000, the plaintiffs initiated this action, asking the court to declare the Final Rule invalid. In September 2000, First South Production Credit Association (now First South Agricultural Credit Association) intervened as a defendant pursuant to Rule 24(c) of the Federal Rules of Civil Procedure. In the interim, the defendants filed a motion to dismiss, or in the alternative, for summary judgment. All interested parties have since filed cross-motions for summary judgment pursuant to Rule 56(c).

## III. ANALYSIS

### A. Legal Standard for Judgment as a Matter of Law

Summary judgment may be granted when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *See* FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C.Cir.1995). Courts have defined a genuine issue as one that could change the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

All evidence and inferences based on evidence must be considered in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment must be granted if the movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. By pointing out the absence of evidence to support the nonmoving party's case, the movant can demonstrate that there is no genuine issue as to any material fact, therefore entitling it to summary judgment. *See id.* at 325, 106 S.Ct. 2548. In the instant case, the court concludes that there is no genuine issue of material fact and that the case is ripe for summary judgment.

### B. Judicial Review of Agency Action

The present case involves the regulatory actions of the Farm Credit Administration, a federal agency charged with administering the Farm Credit Act of 1971. In determining whether an agency proffers a permissible interpretation of a statute it administers, the court employs the two-step analysis set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Applying the *Chevron* test, the court first considers the plain meaning of the statute. The plain meaning of a statute is derived from the statutory language itself, "as well as the language and design of the statute as a whole." *See Mylan Pharm. Inc. v. Henney*, 94 F.Supp.2d 36, 47 (D.D.C.2000) (Urbina, J.) (citing *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988)). If the court determines that Congress has spoken to the precise question presented by the parties, the court must give effect to the unambiguously expressed intent of Congress. *See Chevron*, 467 U.S. at 842, 104 S.Ct. 2778.

Thus, when a statute is clear and unambiguous, an agency may not substitute its own policy for that of the legislature. *See* Singer, SUTHERLAND STATUTORY CONSTRUCTION § 65.01 (5th ed.1992).

 If the court determines, however, that Congress has not spoken to the precise issue because "the statute is silent or ambiguous with respect to the specific issue," the court proceeds to the second step of the *Chevron* analysis. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Under the second step of *Chevron*, the court must determine if Congress either implicitly or explicitly left a gap in the statute that it has delegated to the agency to administer through regulatory means. Where the delegation is explicit, the "legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. Even when the delegation by Congress is implicit, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* Indeed, where an agency's interpretation involves issues of considerable public controversy and Congress has not acted to correct any misperception of its statutory objective, the agency's interpretation is entitled to substantial deference. *See Mylan Pharm.*, 94 F.Supp.2d at 48 (citing *United States v. Rutherford*, 442 U.S. 544, 555, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979)). This level of deference to the agency's interpretation is justified because of the agency's "greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *See FDA v. Brown and Williamson Tobacco Corp.*, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citing *Rust v. Sullivan*, 500 U.S. 173, 187, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991)).

**C. Standards Governing an Agency's Interpretation of its Regulations**

 As with principles governing agency interpretation of congressional statutes, the principles governing an agency's interpretation of its own regulations are well-established. The standard is one of "substantial deference" to the agency's interpretation because "[a]n agency's interpretation of its own regulation merits even greater deference than its interpretation of the statute that it administers." *See Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.*, 194 F.3d 125, 128 (D.C.Cir. 1999) (citing *Bush–Quayle Primary Comm., Inc., v. Federal Election Comm'n*, 104 F.3d 448, 452 (D.C.Cir.1997)). As deferential as this standard is, however, it is not without boundaries. Internally inconsistent reasoning by a government agency is not entitled to any deference by the courts and is inherently arbitrary and capricious. *See Chevron*, 467 U.S. at 837, 104 S.Ct. 2778. In addition, agency action must reflect clear, rational decision making that gives regulated members of the public adequate notice of their obligations. *See S.G. Loewendick & Sons v. Reich*, 70 F.3d 1291, 1297 (D.C.Cir.1995).

**D. Whether the Final Rule Violates the Farm Credit Act (Count I)**

 The plaintiffs argue that the Final Rule violates 12 U.S.C. § 2013(12)(C) because that subsection only permits participation in loans that the lending institution would be able to make directly. *See* Compl. ¶ 65. Under the first part of the *Chevron* analysis, the court must consider the plain meaning of 12 U.S.C. § 2013(12)(C) to determine the FCA's scope of regulatory authority. Chapter 23 of United States Code Title 12 governs the entire Farm Credit System. Subchapter I specifically governs the Farm Credit

Banks. Section 2013 describes the general powers of the Farm Credit Banks and states in part that "[e]ach Farm Credit Bank shall be a body corporate, and *subject to regulation by the Farm Credit Administration,* shall have the power to." 12 U.S.C. § 2013 (emphasis added). The section lists twenty-four activities in which Farm Credit Banks have the authority to participate. The language of each provision is broad and leaves substantial gaps for the FaCA to fill. Congress's silence with respect to the specific scope of authority granted the FCA permits the court to continue with the second part of the *Chevron* analysis. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778.

Under the second part of *Chevron,* the court must consider whether the agency's actions are "reasonable" constructions of its statutory authority. *See Chevron,* 467 U.S. at 844, 104 S.Ct. 2778. Section 2013(12)(C) states that "Farm Credit Banks shall have the power to participate with lenders that are not [System] institutions in loans that the bank is authorized to make under this subchapter." 12 U.S.C. § 2013(12)(C). The plaintiffs interpret this provision to impose geographic restrictions on the Farm Credit Bank's participation authority. *See* Pls.' Mot. for Summ.J. at 48. This interpretation lacks support in the statutory language. No other provision within Title I of the Farm Credit Act contains Congress's express or implicit intention to institute geographic restrictions on Federal Credit Banks. *See* Farm Credit Act of 1971, 1980 Amendments. Rather, Farm Credit Banks are limited only with respect to the types of loans that they are authorized to make. For example, Title I of the Act limits the lending authority of Farm Credit Banks to long-term real estate loans "as defined by the Farm Credit Administration." *See* 12 U.S.C. § 2015(a)(1); Defs.' Mot. for Summ.J. at 13.

Pursuant to 12 U.S.C. § 2013(12)(C), the FCA has issued several regulations limiting the lending and participation ability of Farm Credit Banks. *See* 12 C.F.R. §§ 614.4000(d)(1), 614.4070. Contrary to the plaintiffs' contentions, 12 C.F.R. § 614.4070 contains no reference to geographic restrictions on participation lending. Section 614.4070 deals only with direct lending by Farm Credit Banks to a borrower in another territory. The regulation does not deal in any way with a Farm Credit Bank's ability to *participate* in loans. When a Farm Credit Bank decides to enter a long-term mortgage loan with a borrower whose operation is either partially or wholly located outside the bank's territory, the bank is obligated to provide notice of the loan and receive consent from all other Farm Credit Banks in that territory. *See* 12 C.F.R. § 614.4070(b); 614.4070(c)(1). Thus, both the statute 12 U.S.C. § 2013(12)(C) and the regulation 12 C.F.R. § 614.4070 refer only to direct lending and not participation lending.

Absent any statutory language expressly or implicitly directing the FCA to restrict participation lending by territory, the court must defer to the FCA's interpretation of the statute, provided that interpretation is reasonable. *See Buffalo Crushed Stone,* 194 F.3d at 128 (citing *Bush–Quayle Primary Comm.,* 104 F.3d at 452). In the instant case, the FCA has interpreted its section 2013(12)(C) authority to regulate the making and participation of long-term mortgage loans by Federal Credit Banks. To comply with section 2013(12)(C), the FCA has determined that 12 C.F.R. § 614.4070 will govern direct long-term mortgage loans, thereby requiring both notice and consent from regional Farm Credit Banks. In addition, the FCA has eliminated the notice and consent requirements for purchasing participation in-

terests in long-term mortgage loans, thereby freeing Farm Credit Banks to participate with other lenders in loans originating in other territories without hindrance. Nothing in 12 U.S.C § 2013(12)(C) prevents the FCA from offering this interpretation as a reasonable exercise of its regulatory authority. If Congress had intended there to be uniform regulations with respect to both direct and participation lending, it would have included specific statutory language directing the FCA to that effect, rather than adopting the expansive language in section 2013. *See* 12 U.S.C. § 2013.

Because there is no conflict between the Final Rule and 12 U.S.C. § 2013(12)(C) and because the FCA's interpretation of its statutory authority is reasonable, the court must show deference to the FCA's policy decision with respect to participation lending. In light of the substantial deference that the court is required to give the agency, the court grants the defendants' motion for summary judgment on count I and denies the plaintiffs' motion.

### E. Whether the Final Rule Violates the Farm Credit Act's 1992 Amendments (Count II)

The plaintiffs contend that by allowing System institutions to engage in lending activity within FCB–Texas's chartered territory, the Final Rule violates the Farm Credit Banks and Associations Safety and Soundness Act of 1992. *See* Compl. ¶ 67. In addition, the plaintiffs claim that by granting other System institutions the

right to participate in loans located within Alabama, Louisiana and Mississippi, the Final Rule violates FCB–Texas's charter established by section 401(b) of the same provision.[9] *See* Compl. ¶ 68. The defendants respond that the plaintiffs waived their right to judicial review on these issues because they failed to raise the allegations during the public comment period, and that the Final Rule does in fact conform to the provisions of both 12 U.S.C. §§ 2252(a)(2)(B)–(C) and 2252(a)(13)–(14), as well as to section 401(b) of the 1992 Act. *See* Defs.' Mot. to Dismiss at 14–17.

It is the law of this Circuit that "failure to raise a particular question of statutory construction before an agency constitutes a waiver of the argument in court." *Natural Resources Defense Council v. EPA,* 25 F.3d 1063, 1074 (D.C.Cir. 1994) (citations omitted). The plaintiffs contend that every comment letter challenging the Proposed Rule must be deemed a challenge to all aspects of the Rule, including the provisions dealing specifically with loan participations. *See* Pls.' Mot. for Summ.J. at 25–26. The plaintiffs do not cite any authority to support this proposition. Indeed, careful review of the comments, especially those submitted by FCB–Texas, demonstrates that the comments addressed only the direct lending issues that would have resulted from the changes to 12 C.F.R. § 614.4070. *See id.* FCB–Texas's letter itself makes mention of the participation lending issue only twice,[10] both times in the context of ex-

---

9. In enacting the Farm Credit Banks and Associations Safety and Soundness Act of 1992 Pub.L. 102–552 (1992), Congress elected to codify only section 401(c) of the act. *See* 12 U.S.C. §§ 2252(a)(2)(B)–(C) and 2252(a)(13)–(14). Congress left the remainder of the Act, including section 401(b), not-codified.

10. The plaintiffs' letter to the FCA dated May 3, 1999 mentions loan participations twice. First, in a footnote on page 7, the letter states: "[o]f course, the version of 12 C.F.R. § 614.4070 currently in effect permits a limited form of out-of-territory lending. However, that regulation really only (1) clarifies a potential ambiguity with respect to whether a borrower is actually located within an institu-

plaining how the current version of 12 C.F.R. § 614.4070 operates. *See* AR at 182–3. Because the FCA could not have reasonably construed either statement as addressing a specific challenge to the loan participation regulation, the court cannot charge the FCA with notice that the participation section of the regulation was disputed.

Although FCB–Texas's letter makes many policy and legal arguments against the Proposed Rule, the D.C. Circuit has held that parties cannot be "saved by the fact that they had made other 'technical, policy, or legal' arguments before the agency." *See Natural Resources Defense Council,* 25 F.3d at 1074. To allow the plaintiffs to raise concerns with the loan participation issue in litigation would undermine "the notion of deference to agency interpretations of law embodied in *Chevron . . . .*" *See Ohio v. EPA,* 997 F.2d 1520, 1528 (D.C.Cir.1993) (citing *Chevron,* 467 U.S. at 843–45, 104 S.Ct. 2778). This Circuit has consistently held that "the court [must] be particularly careful to ensure that challenges to an agency's interpretation of its governing statute are first raised in the administrative forum." *See Natural Resources Defense Council,* 25 F.3d at 1074. In addition, a decision on the merits of the plaintiffs' arguments would defeat the principles of agency autonomy and judicial efficiency with which the waiver doctrine is concerned. *See Ohio,* 997 F.2d at 1529 (citing *McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)).

The court therefore concludes that during the public comment period, the plaintiffs did not raise the issue that changes to the regulations governing loan participations violated the Farm Credit Banks and Associations Safety and Soundness Act of 1992. As a result, the arguments have been waived, and the court does not need to reach the merits of the plaintiffs' count II claims. Accordingly, the court grants the defendants' motion for summary judgment with respect to count II, and denies the plaintiffs' motion for summary judgment.

## F. Harm to the Farm Credit System and its Borrowers and Stockholders (Count III)

In count III, the plaintiffs claim that the Final Rule will cause damage to "small, beginning and family farmers" at the benefit of "large, multi-state agricultural organizations and operations." *See* Compl ¶ 70. This damage will "seriously impair the cooperative nature of the System" and therefore is "inconsistent with the Farm Credit Act." *See id.* The defendants respond that this case does not deal with the merits of intra-System competition. Rather, the case deals with two discrete legal issues: "(1) does the Final Rule violate the plain language of the act; and (2) if the court find that relevant statutes to be ambiguous, is the FCA's interpretation of the Act, authorizing the Final Rule, entitle to deference." *See* Defs.' Reply Brief at 3.

The court agrees that because the challenged regulation represents the action of an independent regulatory agency, the court must defer to the agency's action unless the harmed party can show either a direct violation of the plain meaning of the statute or an unreasonable interpretation

---

tion's territory and (2) as discussed [below] provides for the conditions under which *participatory loans,* which the act sanctions, may occur." *See* AR 182 n. 3 (emphasis added). Second, on page 8, the letter states: "[t]he current version of 12 C.F.R. § 614.4070(c)

appears to be an exercise of this specific grant of regulatory authority, to the extent that its notice and consent requirements result in *loan participation* between the out-of-district lender and the local lending institution." *See id.* at 183. (emphasis added).

of the statute by the agency. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. The plaintiffs' numerous concerns about the potential damage the new participation lending regulations may cause to the Farm Credit System are well documented in their papers to the court.[11] These claims, however, share many similarities to the policy arguments made to the agency during the public comment period. *See AR* at 177–206. Because the plaintiffs can assert no legal argument that the Final Rule violates either the plain language of the Farm Credit Act or that the FCA's interpretation of that act is unreasonable, the court cannot address the plaintiffs' policy concerns. The court determines that the policy arguments advanced in the plaintiffs' arguments "create the impression that [the plaintiffs] are now waging in a judicial forum a specific policy battle that they ultimately lost in the agency." *Chevron*, 467 U.S. at 864, 104 S.Ct. 2778. Just as the *Chevron* Court concluded that "[s]uch policy arguments are more properly addressed to legislators or administrators, not to judges," *id.*, this court also concludes that the plaintiffs' arguments in count III are best left to Congress for possible amendment to the Farm Credit Act. Accordingly, the court grants the defendants' motion for summary judgment on count III and denies the plaintiffs' motion.

**G. The Actions by the FCA were Arbitrary, Capricious and an Abuse of Discretion (Counts IV, V, VI)**

In their last three counts, the plaintiffs claim that the FCA, in promulgating the Final Rule, violated the APA. Section 706 of the APA dictates the scope of the court's review of administrative-agency action. Under section 706(2)(A) of the APA, "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). According to the plaintiffs, the FCA violated this provision of the APA by (1) failing to respond to significant comments received in response to its proposed rulemaking; (2) failing to provide significant notice of the substance of the proposed regulation so that interested parties could offer comments; and (3) considering improper factors when deciding to promulgate the Final Rule. *See* Compl. ¶¶ 72–76.

To determine if an agency's action violates the arbitrary and capricious standard, the court must consider:

if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43–44, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This standard is "a narrow one, which does not allow the court to substitute is judg-

---

11. The plaintiffs focus on several policy arguments in their motion for summary judgment. These include the "cooperative and interdependent nature of the Farm Credit System," the fact that competing institutions are "jointly and severally liable for each other's debts," and the fact that "the System and its institutions enjoy a balance of special government-conferred benefits along with particular obligations, so that they can provide the services that Congress intended them to provide." *See* Pls.' Mot. for Summ.J. at 36–7. FCB–Texas bases its claims solely on the anticipated damage that the Final Rule will have on these expressed policy goals.

ment for the agency's." *See Gallegos v. Lyng*, 891 F.2d 788, 790 (10th Cir.1989) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *New Mexico Envtl. Improvement Div. v. Thomas*, 789 F.2d 825, 831 (10th Cir.1986)). Accompanying this narrow standard of review is a presumption in favor of the validity of the administrative action. *See Ethicon, Inc. v. FDA*, 762 F.Supp. 382 (D.D.C.1991).

▮ The agency is also to be accorded deference when it evaluates data within its technical expertise. *See Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972); *International Fabricare Inst. v. EPA*, 972 F.2d 384, 389 (D.C.Cir.1992); *Tri–Bio Labs., Inc. v. United States*, 836 F.2d 135, 142 (3rd Cir. 1987). Nonetheless, this deference is not abdication. The court must find some evidence that supports the relevant factors on which the agency's decision is based. *See Ritter Transp., Inc. v. Interstate Commerce Comm'n*, 684 F.2d 86, 88 (D.C.Cir. 1982). Lastly, the court must review the administrative record as assembled by the agency; the court does not undertake its own fact-finding. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Applying this deferential standard to the agency's action in this case, the court determines that the Final Rule survives review.

▮ With respect to the charge in count IV that the FCA failed to respond to significant comments, it is well settled that "the agency is not required to discuss every item of fact or opinion included in the submissions made to it in informal rulemaking." *See Public Citizen, Inc. v. Federal Aviation Admin.*, 988 F.2d 186, 197 (D.C.Cir.1993) (citing *Automotive Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir.1968)). Instead, when re-

sponding to public comments, the agency must "give reasoned responses to all significant comments in a rulemaking proceeding." *International Fabricare Inst. v. EPA*, 972 F.2d at 389 (citing *PPG Indus., Inc. v. Costle*, 630 F.2d 462, 466 (6th Cir. 1980)). In addition, the agency "need not respond at all to public comments that are 'purely speculative and do not disclose the factual or policy basis on which they rest.'" *Public Citizen, Inc.*, 988 F.2d at 197 (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n. 58 (D.C.Cir.1977)).

▮ Upon review of the record before the FCA, the court determines that the agency satisfied its burden of responding to public comments. The agency noted in its publication of the Final Rule that it received "over 270 comment letters on the proposed rule," none of which commented on any statutory restrictions regarding loan participations. *See* 65 Fed.Reg. 24, 101. Since none of the comment letters focused on the issue of the Final Rule, the court agrees that the comments were not "significant" and therefore the FCA was not required to respond to them. As noted above, many of the arguments expressed in FCB–Texas's comment letter were based on policy disagreements with the direction that the FCA was moving the Farm Credit System. *See* AR 177–206. Significantly, the commentators did not provide any documentation or other evidence to support their argument that out-of-territory lending and intra-System competition would have negative implications on farmers and credit-lending institutions. *See* AR 191–98. In light of the requirement that the agency need not respond to "purely speculative" comments, the court holds that the rulemaking by the FCA was not arbitrary, capricious, and an abuse of discretion.

▮ In count V, the plaintiffs assert that the FCA's rulemaking violated the

APA because there was insufficient notice of the substance of the regulation. *See* Compl. ¶ 74. The plaintiffs argue that the FCA's labeling of the loan participation language in the Proposed Rule as a "conforming amendment" did not afford them notice that the FCA might only enact the participation section without enacting the remainder of the Proposed Rule. *See* Pls.' Mot. for Summ.J. at 30. The plaintiffs further assert that this labeling "leads to the affirmative conclusion that the amendments would not be promulgated on their own." *See id.* at 31. The defendants respond that the Final Rule is a "logical outgrowth of the proposed rule" and that therefore adequate notice was provided for under the provisions of the APA and the supporting case law. *See* Defs.' Mot. to Dismiss at 43–44.

To satisfy the notice and comment requirements of the APA, the regulation must be the "logical outgrowth" of the Proposed Rule. *See National Elec. Mfrs. Ass'n v. EPA,* 99 F.3d 1170, 1172 (D.C.Cir. 1996); *National Mining Ass'n v. Mine Safety and Health Admin.,* 116 F.3d 520 (D.C.Cir.1997). This Circuit has held that "while the 'logical outgrowth' standard does not require the agency to assiduously lay out every detail of a proposed rule for comment, it does require that ... [the agency] 'provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully.'" *See Horsehead Resource Dev. Co., Inc. v. EPA,* 16 F.3d 1246, 1268 (D.C.Cir.1994); *see also National Elec. Mfrs. Ass'n,* 99 F.3d at 1172 (D.C.Cir.1996).

Comparing the Proposed and Final Rule, it is clear that the Final Rule is the "logical outgrowth" of the Proposed Rule, thus meeting the standard required by law. The Proposed Rule plainly indicates the FCA's desire to eliminate the geographic restrictions on several different

types of services, including direct lending, participation lending and other credit related services. *See* 63 Fed.Reg. 60, 220; *see also* AR 477. The Proposed Rule lays each of these proposals out in separate paragraphs, explaining the benefits of removing each individual constraint as well as the overall benefit of removing all geographic restrictions. *See id.* Nowhere does the Proposed Rule indicate that removal of geographic restriction is an all-or-nothing proposal. Therefore, the FCA's decision to remove only the restrictions on participation lending was logical, given the manner in which the Proposed Rule explained the FCA's intentions. Further, the Final Rule expresses the same logical basis for removing the restrictions as the Proposed Rule, namely to diversify the loan portfolios of the Farm Credit Banks and Associations. *See* 65 Fed.Reg. 24, 101; AR 4; *see also* 63 Fed.Reg. 60, 220; AR 477. The court thus determines that the Final Rule was the "logical outgrowth" of the Proposed Rule, and that the FCA did not commit any procedural violations of the APA.

Finally, in count VI, the plaintiffs claim that "the relationship between System and non-System lenders and the desire to strengthen non-System institutions are impermissible regulatory considerations under the Farm Credit Act," and therefore was the arbitrary and capricious standard of the APA. See Compl. ¶ 76. The plaintiffs contend that these policy considerations are impermissible under 12 U.S.C. § 2001 and that the agency therefore relied on factors that Congress did not intend for them to rely on. *See* Pls.' Mot. for Summ.J. at 54–55. The defendants respond that they did consider the factors mentioned by the plaintiffs, yet "not as the ultimate goal of the Final Rule but rather as a way to help farmers and ranchers." *See* Defs.' Mot. for Summ.J. at 39.

Title 12 of the U.S.Code section 2001(a) states that "[i]t is declared to be the policy of the Congress ... that the farmer-owned cooperative Farm Credit System be designed to accomplish the objective of improving the income and well-being of American farmers and ranchers by furnishing sound, adequate, and constructive credit ... necessary for efficient farm operations." 12 U.S.C. § 2001(a) (2001). Therefore, the FCA was entirely within its bounds to consider the relationship between System and non-System institutions if the FCA felt that the well-being and efficient farm operations of American farmers could be best served by strengthening that relationship.

This court ought not substitute its judgment for that of the agencies, especially in areas within the agency's technical expertise. *See generally Chevron,* 467 U.S. 837, 104 S.Ct. 2778 (1984), *FDA v. Brown and Williamson Tobacco Corp.,* 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), *Federal Power Comm'n v. Florida Power & Light, Co.,* 404 U.S. 453, 92 S.Ct. 637, 30 L.Ed.2d 600 (1972). In its Proposed and Final Rule, the FCA cites numerous factors, including the desire to "increase the flow and availability of agricultural credit to farmers, ranchers, and aquatic producers" that it considered when proposing this regulatory change.[12] *See* Defs.' Mot. to Dismiss at 38–39; *see also* 65 Fed.Reg. 24, 101; AR 4. As the plaintiffs did with respect to count III it appears as though they are attempting to raise issues of policy that are best left to the experience and

expertise of the regulatory agency, not the judicial system. Given the substantial deference afforded to regulatory agencies under *Chevron* and its progeny, the court concludes that the FCA did not rely on any impermissible factors in publishing either the Proposed Rule or the Final Rule. The FCA is responsible for the well-being of American farmers and their efficient access to credit. If, in the FCA's judgment, this regulation provides the best possibility for achieving those goals, the court should not second-guess such policy decisions.

Accordingly, with respect to counts IV, V and VI of the complaint, the court will grant the defendants' motion for summary judgment and deny the plaintiffs' motion.

## IV. Conclusion

For the reasons set forth above, the court grants the defendants' motion for summary judgment in its entirety and denies the plaintiffs' motion for summary judgment in its entirety. An Order directing the parties in a manner consistent with this memorandum is separately and contemporaneously executed and issued this ____day of August 2001.

## ORDER

### Granting the Defendants' Motion for Summary Judgment; Denying the Plaintiffs' Motion for Summary Judgment

Upon consideration of the plaintiffs' motion for summary judgment and the defen-

---

**12.** Other factors cited include "diversifying the geographic and industry concentrations in the loan portfolios of Farm Credit banks and associations; remove notice and consent requirements for loan participations purchased from non-System lenders." *See* Defs.' Mot. to Dismiss at 38–39; *see also* 65 Fed. Reg. 24, 101–02; AR 4. In addition, multiple factors were cited directly concerning how the relationship between System and non-System lenders will ultimately help farmers

and ranchers. The cited factors included "cooperation among System and non-System lenders can increase agricultural credit availability, particularly during downturns in the economic cycle, such as the one that agriculture is currently experiencing," as well as "how our [FCA's] former regulations are outdated because the System cannot effectively work with non-System lenders to most efficiently deliver credit to agriculture and rural America." *See id.*

dants' motion for summary judgment, and for the reasons stated in the court's Memorandum Opinion,

it is this 22nd day of August 2001,

**ORDERED** that the plaintiffs' motion for summary judgment be **DENIED;** and it is

**FURTHER ORDERED** that the defendants' motion for summary judgment be **GRANTED.**

SO ORDERED.