United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 19, 2002 Decided June 7, 2002 

 No. 01-1159

 National Multi Housing Council; 
 National Apartment Association; 
 National Leased Housing Association, 
 Petitioners

 v.

 United States Environmental Protection Agency, 
 Respondent

 Battery Council International, 
 Intervenor

 On Petition for Review of an Order of the 
 Environmental Protection Agency

 J. Marks Moore III argued the cause for the petitioners. 
Samuel M. Riley was on brief.

 Jon M. Lipshultz, Attorney, United States Department of 
Justice, argued the cause for the respondent. John C. Cru-
den, Assistant Attorney General, United States Department 
of Justice, and Alan Carpien, Attorney, United States Envi-
ronmental Protection Agency, were on brief.

 David B. Weinberg and Edward Loring Ferguson, Jr. 
entered appearances for the intervenor.

 Before: Henderson, Tatel and Garland, Circuit Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Karen LeCraft Henderson, Circuit Judge: In 1992 the 
Congress passed the Residential Lead-Based Paint Hazard 
Reduction Act of 1992 (Title X1 or Act), which, inter alia, 
amended the Toxic Substances Control Act (TSCA), 15 U.S.C. 
ss 2601 et seq., by adding Title IV entitled "Lead Exposure 
Reduction." In 2001 the Environmental Protection Agency 
(EPA) issued its final "Lead Rule" pursuant to section 403 of 
TSCA, 15 U.S.C. s 2683. See Lead; Identification of Dan-
gerous Levels of Lead, 66 Fed. Reg. 1206 (2001). The 
petitioners, three trade associations representing the multi-
family rental housing industry, challenge the Lead Rule's 
"regardless of source interpretation," which construes the 
statutory term "lead-based paint hazard" to include "lead-
based paint and all residential lead-containing dusts and soils 
regardless of the source of the lead, which, due to their 
condition and location, would result in adverse human health 
effects." Id. at 1207 (emphasis added). The petitioners 
assert EPA's decision to include all hazardous lead-containing 
dust and soil, whether or not the source of the lead is lead-
based paint, is contrary to the Congress's intent in enacting 
Title X and is arbitrary and capricious.2 We reject the 
petitioners' challenge for the reasons set forth below.

__________
 1 The legislation was enacted as Title X of the Housing and 
Community Development Act of 1992, Pub. L. No. 102-550, 106 
Stat. 3672 (1992).

 2 The petitioners also assert the regardless of source interpreta-
tion violates the equal protection clause of the Fourteenth Amend-
ment to the United States Constitution but this argument is waived 

 I.

 Title X directs EPA and the Department of Housing and 
Urban Development (HUD) to take various actions to protect 
the public from any lead-based paint hazard by reducing such 
hazard3 or, of particular relevance here, by requiring disclo-
sure of it. Section 1018(a)(1) of Title X directs HUD and 
EPA to promulgate regulations for the disclosure of lead-
based paint hazards in "target housing," that is, "housing 
constructed prior to 1978," 42 U.S.C. s 4851b(27), which is 
offered for sale or lease. See 42 U.S.C. s 4852d(a). Accord-
ingly, in 1996, EPA and HUD jointly promulgated a final 
"Disclosure Rule" which requires an owner of target housing 
to disclose "the presence of any known lead-based paint 
and/or lead-based paint hazards" before a purchaser or lessee 
"is obligated under a contract to purchase or lease target 
housing." See 61 Fed. Reg. 9064, 9082 (1996) (codified at 24 

__________
because it was not raised before EPA. See National Wildlife Fed'n 
v. EPA, 286 F3d 554, 562 (D.C. Cir. 2002) ("It is well established 
that issues not raised in comments before the agency are waived 
and this Court will not consider them.") (citing Nat'l Elec. Mfrs. 
Ass'n v. EPA, 99 F.3d 1170, 1171 n.1 (D.C. Cir. 1997); Washington 
Ass'n for Television & Children v. FCC, 712 F.2d 677, 681 (D.C. 
Cir. 1983)).

 3 See, e.g., 42 U.S.C. s 4822 (HUD "shall establish procedures to 
eliminate as far as practicable the hazards of lead based paint 
poisoning" and "shall provide for appropriate measures to conduct 
risk assessments, inspections, interim controls, and abatement of 
lead-based paint hazards" with respect to target housing covered by 
HUD mortgage insurance or assistance payments); id. s 4852 
(HUD "is authorized to provide grants to eligible applicants to 
evaluate and reduce lead-based paint hazards in nonpublic hous-
ing"); id. s 4852a (HUD and EPA "shall establish a task force to 
make recommendations on expanding resources and efforts to eval-
uate and reduce lead-based paint hazards in private housing"); id. 
s 4852c (HUD, "in consultation with the [EPA, DOL and HHS], 
shall issue guidelines for the conduct of federally supported work 
involving risk assessments, inspections, interim controls, and abate-
ment of lead-based paint hazards").

C.F.R. s 35.88 (HUD codification); 40 C.F.R. s 745.107 
(EPA codification)).

 Section 403 of TSCA further requires that EPA "promul-
gate regulations which shall identify ... lead-based paint 
hazards, lead-contaminated dust, and lead-contaminated soil." 
15 U.S.C. s 2683. Pursuant to this directive, on January 5, 
2001 EPA issued its final Lead Rule, which, as noted above, 
included EPA's regardless of source interpretation that the 
term "lead-based paint hazard" is "intended to identify lead-
based paint and all residential lead-containing dusts and soils 
regardless of the source of the lead, which, due to their 
condition and location, would result in adverse human health 
effects." 66 Fed. Reg. at 1207. The petitioners seek review 
of this portion of the Lead Rule insofar as it requires them to 
disclose lead contamination in dust and soil from sources 
other than lead-based paint.

 II.

 The petitioners first assert the language of Title X must be 
construed to refer only to lead hazards from lead-based paint. 
In construing statutory language we use the familiar Chevron 
analysis:

 If ... " 'Congress has directly spoken to the precise 
 question at issue,' " we "must give effect to Congress's 
 'unambiguously expressed intent.' " Secretary of Labor 
 v. F[ed. Mine Safety & Health Review Comm'n], 111 
 F.3d 913, 917 (D.C. Cir. 1997) (quoting Chevron USA, 
 Inc. v. Natural Resources Defense Council, Inc., 467 
 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). "If 
 'the statute is silent or ambiguous with respect to the 
 specific issue,' we ask whether the agency's position rests 
 on a 'permissible construction of the statute.' " Id. (quot-
 ing Chevron, 467 U.S. at 843, 104 S.Ct. 2778).
 
Cyprus Emerald Resources Corp. v. Fed. Mine Safety & 
Health Review Comm'n, 195 F.3d 42, 45 (D.C. Cir. 1999).

 The petitioners maintain that EPA's regardless of source 
interpretation contravenes the Congress's unambiguously ex-

pressed intent to target contamination from lead-based paint 
only. In support, they point to the repeated references to 
lead-based paint and to "lead-based paint hazards" through-
out Title X, including, notably, both in section 1018(a)(1), 
which authorized EPA and HUD to promulgate their joint 
disclosure rule, and in the legislation's title; the definition of 
"target housing" to include only "housing constructed prior to 
1978," the year the Consumer Product Safety Commission 
banned residential use of lead-based paint, see 61 Fed. Reg. 
s 9066; and the focus of the pre-enactment congressional 
hearings on the dangers posed by lead-based paint.

 By contrast, EPA maintains that the regardless of source 
interpretation is consistent with the statutory language and, 
in particular, with the statutory definition of "lead-based paint 
hazard" as "any condition that causes exposure to lead from 
lead-contaminated dust, lead-contaminated soil, lead-
contaminated paint that is deteriorated or present in accessi-
ble surfaces, friction surfaces, or impact surfaces that would 
result in adverse human health effects as established by the 
appropriate Federal agency." 42 U.S.C. s 4851b(15); 15 
U.S.C. s 2681(1). EPA contends that because the three lead 
sources--dust, soil and deteriorated paint--are enumerated 
separately, and neither "lead-contaminated dust" nor "lead-
contaminated soil" is anywhere defined to require that the 
lead contamination derive from paint, the Act permits regula-
tion of lead contaminated dust and soils regardless of the 
source of the lead.

 We agree with EPA that the Act's definition does not 
represent the Congress's " 'unambiguously expressed' " intent 
in view of the statutory definition which broadens the term 
beyond its literal meaning by including lead-contaminated 
dust and soil without expressly limiting the source of the 
contamination to lead-based paint. This being so, we apply 
the second step of Chevron and conclude that EPA's interpre-
tation reflects "a permissible construction of the statute." 
Cyprus Emerald, 195 F.3d at 45.

 The arbitrary and capricious standard requires only that an 
agency "examine the relevant data and articulate a satisfacto-

ry explanation for its action including a 'rational connection 
between the facts found and the choice made.' " Motor 
Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 
U.S. 29, 43 (1983) (quoting Burlington Truck Lines, Inc. v. 
United States, 371 U.S. 156, 168 (1962)). EPA satisfied this 
standard here. In its response to comments, EPA explained 
that "while [its] decision to cover lead in dust or soil regard-
less of the source of the lead is based on the directives of the 
statute," it is also justified for the additional reason that there 
is no "good technical basis to exclude from coverage based on 
the lead source, dust or soil--particularly dust and soil with 
high levels of lead." EPA Response to Comments at 32-33 
(Dec. 22, 2000). Among the technical problems EPA cited is 
that, "as a practical matter, with current scientific technology, 
it is not possible to determine with good precision how much 
of the lead in dust or soil in a specific room or area originated 
from lead paint in a specific dwelling unit on a specific 
building component" so that "there is a distinct absence of a 
scientific method to determine conclusively that the source of 
lead in dust or soil is not paint on a routine basis." Id at 31-
32. At oral argument the petitioners' counsel agreed that it 
is impossible "under current technology" to ascertain whether 
lead contamination in soil and dust derives from lead-based 
paint or from some other source. In light of the technological 
limitation, EPA reasonably required disclosure of all lead 
contaminated soil and dust regardless of source in order to 
carry out the Congress's undisputed intent to require disclo-
sure and abatement of all hazardous contamination from lead-
based paint. A contrary rule requiring disclosure only of 
contamination known to be from paint, which appears to be 
what the petitioners seek, would inevitably prevent disclosure 
of some paint-based contamination because its source cannot 
be determined.4

__________
 4 It is not clear that EPA's regardless of source interpretation 
even imposes any additional disclosure obligation on the petitioners. 
At oral argument their counsel all but acknowledged that in the 
absence of EPA's interpretation a seller would nevertheless be 
obligated to disclose lead contamination.

 For the foregoing reasons, the petition for review is

 Denied.